## FARWELL *et al.* *v.* STURGIS WATER CO.

1. Water from a spring on defendant's land disappeared, within the limits thereof near a canon, which, about two miles further on, joined with another channel to form the bed of a stream flowing through plaintiff's

land. To prove that the water from this spring, before its diversion, formed part of such stream, plaintiffs introduced evidence that since such diversion the water in such stream, and in the wells and pools near by had perceptibly diminished. Defendant showed that since such diversion there had been less rainfall; that the timber about certain other springs, from which water flowed into the stream, had been cut; that more land had been plowed and more stock kept along the stream; and that, in the canon located near the point where the water from the spring disappeared, water flowed only for a few days during the season of heavy rain; and two geological experts testified that the formation in the vicinity of the spring was such as to exclude any probability that the waters thereof, after disappearing on defendant's land, reappeared to form part of the stream. *Held*, that the evidence was insufficient to show that the water from the spring formed part of the stream.

2. When the trial is by the court, and the findings are excepted to, the appellate court is required to review the evidence.

3. Where the issue was whether the water from the spring formed part of the stream, a personal examination of the spring and stream by the trial judge, not being authorized by law, will not be regarded by the appellate court in considering the sufficiency of the evidence on the issue.

(Opinion filed Jan. 22, 1898.)

Appeal from circuit court, Meade county. Hon. A. J. PLOWMAN, Judge.

Action to enjoin the maintenance of a dam and the diversion of the waters of a creek from their natural channel. Plaintiff had judgment, from which and from an order denying a new trial, defendant appeals. Reversed.

The facts are stated in the opinion.

*Edwin Van Cise, R. H. Kirk,* and *W. A. Stuart,* for appellant.
*McLaughlin & McLaughlin,* for respondents.

CORSON, P. J. The plaintiff's, Farwell and others, claiming to be the owners of agricultural land along a small creek in Meade county, known as "Alkali Creek," brought this action as riparian owners to enjoin the defendant from maintaining any dam or dams on said creek, and from diverting the waters of the same from their natural channel. A trial by the court resulted in findings and judgment for the plaintiffs, and from this

judgment, and order denying a new trial, the defendant appealed.

A brief statement of the facts will be necessary to a proper understanding of the question involved. Alkali creek has its source in the foothills on the easterly slope of the Black Hills, and runs easterly about 30 miles to the Belle Fourche river. The plaintiffs' lands, to which they acquired the government title prior to 1892, lie upon said creek, easterly of the Ft. Meade military reservation, and from 5 to 10 miles from the springs from which the defendant takes the water to supply the citizens of Sturgis City and Ft. Meade. In the spring months there is a continuous stream of water flowing over the surface easterly of the reservation, but in ordinary years, after July, the water only appears at the surface in the form of pools and sink holes or wells. The springs above referred to, and which will hereafter be designated the "Davenport Springs," are situated about four miles from Sturgis City, and in the hllls westerly of the Ft. Meade reservation. In 1892, Joseph J. Davenport made a location of 50 inches of the water of these springs, and erected a dam, on his own land, a short distance below the springs. There are a number of springs along said creek and its tributaries, only one of which will be specially noticed in this opinion in addition to the Davenport springs. The springs at the time of the alleged appropriation, appeared at the surface of the ground on the land owned by the said Davenport, grantor of the defendant, and, after flowing a mile or more, disappeared within the limits of said Davenport's land. From the point where these waters disappeared there is a canon, through which water, in the spring, after heavy rains, flows from 1 to 2 miles, and joins the waters flowing from springs, known as "Meyer Springs," that appear at the surface 2 or 3 miles easterly from the Davenport springs, and flow about 1½ miles in another water channel, where it unites with the channel from the canon above mentioned. The waters from the Meyer springs flow in a continuous running stream during

a large portion of the year, and the waters constitute a part of the waters of Alkali creek.

The important question in the case was, did the waters from the Davenport springs, prior to their diversion, constitute a part of the waters of Alkali creek?  Assuming, without deciding, that the plaintiffs were entitled to have the waters naturally flowing in said creek, and constituting a part thereof, flow down their natural channel by their land, it was incumbent upon them to prove by a preponderance of evidence that the waters of the Davenport springs did come to the surface again, or, at least, did constitute a part of the water of Alkali creek, at or above their land.  To establish this fact plaintiffs introduced a large number of witnesses, who testified, in substance, that they had been acquainted with Alkali creek for many years, and that prior to 1892, when a part of the waters of the Davenport springs were diverted, there was more water flowing in said creek where plaintiffs land was situated, and in the dry season the pools for watering cattle contained much more water, and that the water in the wells along the creek came nearer to the surface than since 1892; that since 1892 many of the water holes had, in the dry season, entirely dried up, and in others the water was much less; and that the water in wells along the creek had perceptibly diminished, and in some cases the wells had become dry.  No direct evidence was offered to show that the waters of the Davenport springs ever came to the surface along Alkali creek, or constituted an underground stream along said creek, at any point; and the longest time water had been known to run in the channel from the point where the springs disappeared to the junction of that channel with the channel with the Meyer springs, in any one year, was 11 days, in the spring of 1890, when there was a large body of melting snow and continuous rains.  The evidence as to the quantity of water being largely diminished in Alkali creek after 1892 was controverted by a large number of witnesses on the part of the defendant, and it was shown on the part of the

defendant that the seasons as to rainfall and drought during the summer and fall months, varied greatly in different years, and that in the years since 1892 there had been less rainfall and drier seasons, and that the timber about the Meyer springs had been cut off, more land cultivated and more stock kept along the creek, to consume the waters.

Upon the question as to whether or not there was such a stream as constitutes in law a water course above the Davenport springs, the evidence was conflicting; but we do not deem it very material, as, if there was such a water course, the waters disappeared with the Davenport springs water on the Davenport land. The evidence of the witnesses for the defendant, independently of the two hereinafter mentioned, established clearly that, from the junction of the channel with the Meyer springs channel to the point where the Davenport springs water disappeared, about 1½ miles, no water, except as stated, at the time of the early spring rains, ran over the surface, or, so far as could be ascertained, in the channel or canon beneath the surface, and that after heavy rains in the spring it was from eight to 16 hours before the water would flow in that channel or canon. The clearest account of the manner and time when the water would flow in said canon is given by Mr. Henry S. Perrin, a witness on behalf of the plaintiff. He says: "I know the canon of Alkali creek; live upon the canon; have lived there ever since 1888. I have observed the canon after heavy rainfalls, and it generally comes down then in a kind of flood—comes with a rush. It generally takes from 8 to 16 hours for the water to get down to the mouth of the canon, but that depends upon the heft of the rain. Water flows down through that canon generally in the spring, when there is a heavy rain—in April, May, and June. The longest I ever knew the water to run there was 11 days. I think that was in 1880 [corrected as 1890]. It takes a very heavy rain to get water flowing from the head to the mouth."

The defendant proved its location of 50 inches of water of these springs in 1892, calling the creek on which the location

was made "Silver Creek," or "Warner Creek," and also offered evidence tending to prove the ownership of the lands on which the springs appear and disappear, and that it has diverted but a small portion of the waters flowing from said springs. The defendant also called two expert witnesses, Frank C. Smith, the professor of geology at the School of Mines at Rapid City, and Dr. V. T. McGillicuddy, dean of that institution.

Mr. Smith, after a very lengthy description of the geological formation of the country about the Davenport springs, and along the Alkali creek, says: That the Davenport springs appear at the surface in trachyte, and flow along a channel in the same formation, until they reach a carboniferous, cavernous, limestone bluff, 300 feet or more in thickness. That the limestone at this point has a dip of about ten degrees to the west of north. The direction of the canon and Alkali creek are practically easterly and westerly. That in the vicinity of the disappearance of the waters of the springs is a cave in the limestone, about 350 feet in depth, and about 200 feet below the surface of the canon, and he and Dr. McGillicuddy explored it for a distance of 500 feet, and in the bottom of which they found small pools of water; and he sums up the result of his investigation as follows: "Under the circumstances, I can see no way that the waters disappearing in the limestone could reappear in the agricultural district east of the military post." He further says, in answer to a question propounded by the plaintiffs' counsel, that he would not think that there was any probability that taking out of the waters of the Davenport springs had anything to do with the disappearance of the water in Alkali creek. This witness also made an analysis of the waters of the Davenport springs and the Meyer springs, and found that, while the Davenport springs water was quite pure spring water, that from the Meyer springs was strongly charged with gypsum, giving it the character of alkali water.

The evidence of Dr. McGillicuddy was more positive as to the fact that the waters of the Davenport springs, after disap-

pearing, could not reappear on the surface anywhere west of the Missouri river. In regard to their disappearance he says: "Descending the stream, the trachyte disappears under the carboniferous limestone. The water totally disappears in the vicinity of where that contract would be." In regard to the water found in the Alkali creek in May, 1876, he says: Last Monday we observed the course of that old channel from the mouth of the canon down to the junction with those gypsum springs, and with reference to the water we found a running stream in places—stream running from one pool to another. There were some pools in the stream. It was a very small stream. There was no indication that I observed that would tend to connect that water running from pool to pool with the water that disappears at the limestone I have referred to next to the trachyte. I would attribute that to the said drainage there in the Red valley. In that place it drains quite a scope of country; drains all the country from their head to where they strike the South Cheyenne or the Belle Fourche; drains all the country from the divides on either side. In making the survey of 1875 I visited the locality of Alkali east of the reservation, I was down the valley to some extent. That stream drains a large area. The valley is very wide, and it takes in that scope of country between Bear Butte and Elk Creek divides. In 1875 there were a number of springs along that creek. At that time there was no stream coming down from the canon. After 1875 I returned to the Hills with Gen. Crook from the Big Horn country, and from that time to the present I have been in the Hills or vicinity of the Hills. I would cross that old, dry channel that we saw the other day, coming down from that canon, two or three times a year, for the last 20 years. I do not remember seeing water run there. I have heard some of the witnesses of plaintiffs testify to the reduction of the water supply that is found in Lower Alkali, east of the reservation. If that is the fact, considering the formation and investigation of the bed of the canon, I do not

see any connection between that and the disappearance or with-drawal of the water by the system of waterworks of the defend-ant, at the springs I visited in the Hills. Do not see any pos-sibility of there being any connection there whatever. The water that disappears at or about the junction of the trachyte with the limestone cannot reappear anywhere in the region west of the Missouri river." Again, he says: "If there should have been any diminution in the water supply of Alkali creek, there are a number of causes that it might be attributed to. Increased cultivation of land would have quite a bearing. I heard the testimony of plaintiffs' witnesses yesterday. Sup-posing that they were correct in their statements that there was a diminution of water in their wells, or in the water holes, or in the flow of the stream, there are both natural and arti-ficial causes that it could be attributed to. In the way of nat-ural causes, there has been the general drying up of the coun-try—general diminution of rainfall all over the western country for the last few years; in fact, not limited to the Black Hills region, but Nebraska, Kansas, and all through this country east of the Rocky Mountains. The plowing of land would have some effect, too. It would interfere with the immediate collection of water in the water holes in the creek. The water, instead of going immediately into the water holes, running down over the hard ground, would all sink in more or less, and would be held up in the plowed land. The increase of culti-vated land would have an effect upon the evaporation of moist-ure in this way. When the ground is plowed up, and the sur-face made porus, that would then, instead of running down, and being held in these water holes, in small space, be held under the plowed surface, which would be conducive to evap-oration. If water gets in the sod, it will be held better there than in the plowed land. The cutting of timber on the hills in the vicinity would decrease the amount of water going into the the land, and increase the evaporation. The amount of plow-ing would have to be considerable in order to have any appre-ciable effect. The cutting of timber would also have to be."

We have only given a few brief extracts from the evidence, as any attempt to even summarize it would extend this opinion to an unreasonable length; but, after a careful examination of all the evidence in the case, we are clearly of the opinion that the same preponderates in favor of the theory that the waters of the Davenport springs never reappear in Alkali creek. It seems quite clear from the evidence before us that the waters of the Davenport springs, and the waters coming into the same from above, disappear with the trachyte under the cavernous and carboniferous limestone; and, in view of the geological formation of the country in that vicinity, it is shown by the evidence to be exceedingly improbable that those waters would find their way up through the limestone formation to the surface, or in such manner as to constitute any part of the waters of Alkali creek. The inference, therefore, that might be drawn from the evidence on the part of the plaintiffs, that because there was apparently less water in Alkali creek subsequently to 1892, the diversion of the waters of the Davenport springs was the cause of such diminution, was clearly refuted by the evidence that such diminution could have been the result of natural or artificial causes, and by the evidence that the waters of said springs disappeared from the surface under the limestone, and could not have again appeared upon the surface, so as to constitute a part of Alkali creek, from the very nature of the geological formation of the country through which said creek runs. The burden being upon the plaintiffs to make out their case by a preponderance of the evidence, it was incumbent upon them to introduce some evidence, at least, tending to show that the waters of these springs did, in fact, reappear upon the surface. But no evidence upon this point was given, and hence the plaintiffs failed to make out their case, and the evidence as it stood at the close of the trial clearly was insufficient to justify the findings of the court, or, in other words, the findings were clearly against the weight of evidence. When the trial is by the court, this court is authorized and required

to review the evidence when the findings have been properly excepted to.  Randall v. Burk Tp., 4 S. D. 337, 57 N. W. 4.

The learned counsel for the respondents has called our attention to the fact that the judge of the circuit court made an examination of the springs and creek himself.  But, as the law has made no provision for such an examination by the judge, and has not provided any method by which the result of such an examination can be reviewed by this court, we are compelled to disregard it in the consideration of the case, and to look only to the evidence presented by the record.  The conclusions necessarily lead to a reversal of the judgment of the circuit court, and render the consideration of other questions raised by the record unnecessary.  The judgment of the circuit court, and order denying a new trial, are reversed, and the case is remanded for such further proceedings as may be in accordance with law.