WESTERN BUILDING COMPANY, Respondent, v. J. C. PENNEY COMPANY, et al, Appellants.

(245 N. W. 909.)

(File No. 7155.   Opinion filed December 13, 1932.)

*Hitchcock & Sickel,* of Mitchell, for Appellants.

*E. E. Wagner* and *Florence Ryan Foss,* both of Mitchell, for Respondent.

CAMPBELL, P. J.   Plaintiff owned a four-story brick building in the business section of Mitchell, S. D. The three stories above the main floor were constructed and have been used for office purposes.   The main or ground floor was designed and constructed for occupancy by a bank and was so used and occupied by the Western National Bank until its closing some time in 1924.

The rear portion of the ground floor was divided into apartments or rooms suitable for small stores and a barber shop and was so occupied and used. In the basement were heating equipment, storage space, etc. In July, 1926, plaintiff leased to defendant J. C. Penney Company the ground floor and basement of said building, excepting that portion of the basement reserved for the furnace room, coal storage, and barber shop, for a term of twenty years from and after July 1, 1926, at an annual rental of $5,400; defendant desiring and expecting to use the premises for the conducting of a retail merchandising business. To fit the premises for such use, extensive changes and alterations were necessary, including the installation of a modern store front and show windows, rearrangement and alteration of the elevator shaft and entrance and passageway thereto, change in the stairway leading to the upper floors, change in heating and plumbing systems, change in and removal of partitions, and various other matters. These changes and alterations, all with the consent and approval of plaintiff, were made by defendant at an expense of some $18,000 or $20,000 immediately upon the execution of the lease and before attempting to occupy the leased premises or conduct a business therein. Such changes and alterations having been completed, the Penney Company installed its merchandise and fixtures and has henceforth conducted its retail business therein. Early in 1930 defendant company proposed to make further changes and altreations in the leased premises at an approximate expense of some $3,500, prepared plans and specifications for the work, and let a contract therefor to the defendant Bjodstrup, sole trader under the name of Pioneer Bridge Company. The defendant Bradley Young is local manager of the business of defendant J. C. Penney Company at Mitchell. The contemplated alterations were for the purpose of accommodating the growth of the Penney Company's business and improving and increasing space and facilities available for displaying and selling merchandise. The nature and extent of the intended alterations is fairly summarized in appellants' brief as follows:

"First. The construction of an opening at the east end of the store room on the first floor just inside the east entrance for the purpose of making a passageway to the basement for the purpose of making the basement available for displaying and selling merchandise.

"Second. To remove the north and west partitions of the ladies' rest room on the ground floor, which partitions are approximately 12 feet by 8 feet respectively, and to remove the plumbing and cement floor in said room, so as to make the space therein available for selling merchandise, and to replace the cement floor so removed with new wood to match the present floor in the sales room and to match the present walls with the rest of the sales room.

"Third. To construct a tile partition at a point 8 feet from the west end of the north basement to separate from said north basement a space to the west of said partition for unloading merchandise.

"Fourth. To lower the floor in the southeast corner of the basement by approximately 2 feet to the same level as the floor now in the north basement, excavating an area of about 23 square yards, to be finished with a 4-inch concrete basement floor, and the side walls supported by concrete walls, and to construct a tile partition to the ceiling of the basement.

"Fifth. To lay a sewer pipe under the basement floor from the southeast corner of the building in the excavated area, extending north into the north basement, then west in said basement to connect with the existing 4-inch sewer pipe leading to the sewer in the alley at the rear of the building.

"Sixth. To install in the southeast corner room of the basement two toilets and lavatories to connect with the sewer pipe referred to above, and to construct a vent not less than two nor more than four inches in diameter, as required by city ordinance, from said room upward at the southeast corner of the building to the roof.

"Seventh. To construct and install three hundred feet of additional radiation in the basement to make it available for use as a place for displaying and selling merchandise, and to remove two radiators on the first floor.

"Eighth. To finish said north basement and ladies' rest room with metal ceilings, and protect all exposed retaining walls with concrete caps, and surface all walls with cement plaster, and decorating both rooms."

After the letting of the contract to Bjodstrup and the performance of some of the work thereunder, particularly some of the excavating in the basement, plaintiff, not having consented to the

proposed alterations or changes, or any thereof, excepting as such consent might be derived through the terms of the lease which will hereinafter be discussed, and being unwilling that the same should be made, and claiming that defendant had no right to make the same, instituted the present action. The prayer of the complaint is for a permanent injunction against the making of the proposed changes and alterations and for the determination and assessment of plaintiff's damage for the things already done pursuant to the 1930 contract with Bjodstrup, and that defendants be required to restore and replace all cement, earth, and other materials removed and restore the premises to the condition in which they were prior to the doing of any work under the 1930 alterations contract. Issue was joined, and the matter came on for trial before the court without a jury. It appears that the learned trial judge, of his own motion and not by mutual consent of counsel, made a personal inspection of the premises, and at the close of the testimony he stated, "Let the record show that the court has made a personal investigation of the premises and particularly of the basement where the work of making alteration is in progress." He than proceeded to make an oral statement setting forth his general ideas and theories with reference to the case and some of the things he had observed on his visit to the premises, all of which presently emerges as about eight typed pages of the transcript indexed by the reporter under the heading "Opinion of the Court." Findings and conclusions were thereafter made in favor of the plaintiff, and judgment was entered enjoining all the contemplated work and changes, ordering that the excavation made in the basement should be filled, replaced and reinforced, and full and complete repairs made by the plaintiff, and providing further "that the plaintiff have and recover of the defendants, J. C. Penney Company and Bradley Young, all of the damages sustained by it by reason of any of the acts found to have been done and performed by said defendant in paragraphs IV, VI, VII, VIII, and IX of said Findings of Fact, and the Court retains jurisdiction of said cause for the purpose of ascertaining and determining the amount of the plaintiff's said damages, and of making and entering any further order or judgment in this action as shall be necessary to do full and complete justice and equity between the parties hereto."

From this judgment and from a denial of their application for new trial, defendants have appealed.

■ ■ Before consideration of the case upon the merits, two matters of practice press themselves upon our attention from the face of the record. The first is with reference to the form of the judgment. A judgment is defined by section 2484, R. C. 1919, as "the final determination of the rights of the parties in the action." We have recently had occasion to give some consideration to the question of just what constitutes a judgment as a matter of law in Re Badger State Bank, 60 S. D. 484, 245 N. W. 41. Every direction of a court or judge made and entered in writing and not included in a judgment is an order. Section 2592, R. C. 1919. Excepting in cases specifically authorized by statute (e. g., cf. sections 2909, 1914, 165, R. C. 1919), the practice under our Code recognizes no such thing as an interlocutory judgment, and the attempt to enter one in this case cannot be effective. What is denominated the judgment in this case must be deemed, as a matter of law, one or the other of two things. It is either final judgment, in which event the language seeking to retain further jurisdiction of the cause should be regarded as mere surplusage and void and ineffective for any purpose, or it is not a judgment at all but merely an interlocutory order, in which event the record would have to be made and the apepal would have to progress in all respects as an appeal from an order and not as an appeal from a judgment. It is apparent in this case that issue was joined upon proper pleadings, and trial was had and final judgment could and should have been entered. We deem it proper under the circumstances of this case, therefore, to treat the determination and direction of the trial court, although purporting to be interlocutory in form, as the final judgment in the cause and to disregard as ineffective for any purpose the portion thereof purporting to retain further jurisdiction in the matter.

■ The second preliminary matter is with reference to what is referred to in the briefs as the opinion of the court. Our statute requires that, upon the trial of a question of fact by the court, the decision of the court must be given in writing and filed with the clerk; the facts found and the conclusions reached being separately stated. Sections 2525, 2526, R. C. 1919. Any expres-

sion of opinion or views by the trial judge extraneous to his decision in the manner and form contemplated by law is of no binding force or effect as a matter of law either upon the trial judge himself or any one else. Cf. Agard v. Menagh, 60 S. D. 262, 244 N. W. 379; Klundt v. Hemenway, 60 S. D. 248, 244 N. W. 377. Such expressions by the trial judge are, of course helpful and indeed almost necessary in advising counsel as to the views of the court and for the information of counsel in drafting findings and conclusions for presentation to the court. But such expression of opinion constitutes no proper part of the record on appeal, whether announced in the form of an oral statement in open court transcribed by the reporter or in the form of a memorandum or letter addressed to counsel. See Morrow v. Letcher (1897) 10 S. D. 33, 71 N. W. 139; Norman v. Miller (1918) 40 S. D. 399, 167 N. W. 391. With reference to the inspection of the premises in question by the trial judge, while such an inspection may be proper in the discretion of the court to assist in proper understanding and application of the evidence introduced at the trial (cf. Mason v. Braught [1914] 33 S. D. 559, 146 N. W. 687), nevertheless the trial judge cannot, by stating to the record what he has seen and observed on such inspection, make himself a witness in the case, unsworn and not subject to cross-examination. So far as the appeal is concerned any inspection of the premises by the trial judge must be entirely disregarded in the consideration of the case, and this court can look only to the evidence presented by the record. See Schmidt v. Norbeck (1922) 45 S. D. 557, 189 N. W. 524; Brady v. Shirley (1901) 14 S. D. 447, 85 N. W. 1002; Farwell v. Sturgis Water Co. (1898) 10 S. D. 421, 73 N. W. 916.

Coming then to the merits of the cause, it is apparent that the single ultimate question presented is as to the right of appellants to make the proposed changes and alterations. The solution of this question requires a consideration of relevant portions of the written lease, and permits, so far as may be requisite for aid in construction and interpretation of the written lease, some consideration of the facts and circumstances antecedent to and attendant upon its execution and delivery.

It appears from the record that the matter of the lease of the premises in question by the Penney Company had been a subject

of discussion between respondent and the Penney Company for some little time and particularly for several days prior to June 15, 1926. In such negotiations the Penney Company had been represented by their local manager, Bradley Young, and more particularly by one Oscar Turner, who appears to have been at Mitchell for the express purpose of handling the matter. The parties were not able to arrive at an agreement, and Mr. Turner left Mitchell. Very shortly after his departure, respondent appears to have decided to accept the final proposition made by Mr. Turner in behalf of the Penney Company, and respondent and the local manager of the Penney Compeny joined in transmitting to Mr. Turner at Minneapolis the following telegram under date of June 15, 1926:

"To Oscar Turner Care Raddison Hotel Minneapolis Minn

"Accept proposition as July first less rentals from present tenants stop One years rent in advance or equivalent stop Repair clause as outlined Redecorate every five years Plate Glass insurance as agreed stop Alterations their approval as to main structural changes Elevator to be handled at same time owners to pay own charges stop Some adjustment or agreement as to front north basement Description lots one and two block eight original Mitchell Will send you lease

"Western Building Company<br>"Bradley Young"

Immediately upon receipt of this telegram, Mr. Turner appears to have prepared a proposed form of lease and forwarded the same to respondent at Mitchell. The lease was made out in duplicate upon a printed form which respondent had seen in their earlier negotiations. This seems to be a printed blank prepared by the Penney Company for its use in making leases, and contains blank spaces following the printed paragraphs and subdivisions of the lease for the insertion of typed or written matter, with the apparent intention of making the general form applicable in particular instances in accordance with varying situations and conditions. The lease as submitted to respondent by Mr. Turner describes the premises, fixes the rental and manner and method of payment thereof, etc., and provides that the lessee may sublet said premises or any part thereof for any legitimate purpose excepting the sale or distribution of intoxicating liquors. One paragraph

of the printed lease is entitled in the margin "Alterations." This paragraph reads as follows:

"Alterations

"The said lessor does hereby give to the lessee the right and privilege at all times during the continuance of this lease or any renewal thereof, to make at its own expense such changes, improvements, alterations and additions to the herein leased premises, as lessee may desire, providing the above mentioned are not of the kind and character that will impair the structural strength of the building of which the herein leased premises are a part or the whole. If at the time of making any changes, improvements, alterations and additions to the herein leased premises the lessee is obliged, by reason of any State laws or local ordinances to expend moneys over and above the sum necessary to alter the premises to suit the special needs of the lessee then the lessor shall reimburse the lessee for all such additional expense. *Lessee is to make its own alterations requiring from the contractor who does the work a bond protecting the lessor and lessee as their interest may appear from loss or damage to property or person during the construction work. Lessor is to bear the expense of turning the elevator around to face the south as will be shown on Lessee's plans and specifications.*"

The above-quoted provision with reference to alterations is found in the printed portion of the lease excepting only the italicized portion thereof, which is inserted in typewriting in a blank space in the lease form immediately following the printed portion. Upon receipt of this lease from Mr. Turner the respondent corporation immediately executed the lease in duplicate and forwarded the same on June 17 to the New York office of the Penney Company under cover of a letter reading as follows:

"Gentlemen: In re: Mitchell Lease.

"We submit herewith the following papers:

"1. Lease executed by us.

"2. Copy of telegram to Mr. Oscar Turner.

"3. The hereinafter mentioned amendment to the lease.

"The enclosed lease was drawn by Mr. Turner after leaving Mitchell without any guidance except the enclosed telegram and

his recollection of the oral negotiations therein referred to. We consider the following changes and additions necessary in order to clarify the lease and to conform it to the actual understanding as embodied in or referred to by the telegram. These changes all relate to the typewritten portions of the lease.

"Premises: Add to the typewritten portion under this head the following:

" 'Lessor also reserves north basement entrance and outside areaway and also the east room in the north basement.'

"Rentals: Substitute for the typewritten addition to this section the following:

" 'Lessee is to pay its first year's rent in cash in advance and on or before the 1st day of July, 1926, or at its option substitute its note for the first year's rent made payable to the Mitchell National Bank of Mitchell, South Dakota. This note shall be cancelled by a payment of the monthly rental should lessee elect to give its note instead of paying the first year's rental in advance. Should lessee pay the first year's rent in cash in advance, it may discount same at the rate of seven per cent on the monthly installments of such rent thereby anticipated.'

"We shall expect to credit you with rental at the full rate for that portion of the month of July which may elapse before delivery of possession and for a period ending not later than July 15th.

"Repairs: Add to the typewritten portion under this head the following:

" 'It is understood and agreed that upon request, lessee will procure such plate glass insurance as the lessor may request, at lessor's cost.'

"Alterations: Add to the typewritten portion of this section, the following:

" 'It is mutually understood and agreed that the lessee contemplates alterations which include the installation of a modern store front and show windows and changes in or removal of some or all of the present partitions and entrances in the leased premises, the changes proposed, to be done in a first class manner and at an approximate cost of $20,000, that a new elevator entrance and a passage way leading to the present elevator is to be constructed next to the south wall of the building in the same style and of the

same width as that now in use in said building, providing for entrance into the elevator shaft and stairway and necessary changes in the stairway leading to the second floor and the work of changing the elevator to provide for a south entrance thereto, it being understood and agreed that the changes in the elevator cage and mechanism shall be at the expense of the lessor and paid by the lessor when the work is completed.

" 'It is further understood that the lessor shall be consulted in regard to the proposed alterations, and that the completed plans thereof, particularly insofar as the same concern the elevator entrance, passage way, elevator, stairway and the general exterior appearance of the building, shall be submitted to the lessee before construction work is begun.'

"We adopt this method of submitting the matter in order to save time, and suggest that these amendments be typed on riders to be pasted at appropriate places on the written lease. The lease may then be executed by you and one of the originals returned to us.                    "Yours very truly,
          "Western Building Company, President.

"P. S.: The following provision may also be incorporated in the lease if desired:

" 'It is further understood and agreed that if means can reasonably be devised to provide adequate coal storage space without the use of the south coal room, measuring about 10x28 feet, the lessor will permit lessee to remove said south coal room and to use the space now occupied thereby, without additional rental.'

. "Western Building Co.,
          "By Donald Fellows, President."

The Penney Company in response to this letter advised respondent that they preferred to make no changes in the lease itself, since such lease had already been executed on the part of respondent, but that they would prepare and forward a separate agreement to be attached to the lease covering the matters suggested in respondent's letter of June 17, and they further advised respondent by letter as follows:

"In regard to the reservation of the north part of the basement we cannot agree to any arrangement wherein we would

sacrifice this space as we are certain · we will need it for selling space.

"Referring to the suggested clause pertaining to submitting our plans and specifications for your approval, our Mr. Myers will be on the ground to study the situation, and to plan and supervise the construction. He will work with you, and we are sure you will find he will give you a much better appearing structure than you would require, as we are just as eager as you are—in fact probably more so—that the building when completed shall be the finest we know how to build, and reflect as nearly as masonry can the high ideals and substantial values of our organization.

"We are depositing the first year's rent in acordance with one of the above paragraphs and will draw up the supplementary instrument as above suggested as soon as we receive your approval of it."

On July 2 the Penney Company wrote respondent as follows:

"We are enclosing two copies of the lease on the Mitchell storeroom, and have prepared a Supplementary Agreement which we have attached to each copy of the lease. This is drawn in line with your letter and letter of Mr. Bradley Young and with Mr. Oscar Turner present. Will you kindly have this Supplementary Agreement executed on both copies of the lease and return the copy marked 'A' to us?

"We are today mailing the Mitchell National Bank our check for $5,226.75, which represents one year's rental in advance, less discount at the rate of 7%. This check will be held by the bank until the Western Building Company can satisfy the bank officials that they are the owners of the property. When this has been done, the bank has been instructed to deliver the check to the Western Building Company.

"We are sending copies of this correspondence to Mr. Young so he will be conversant with the situation. We feel that you are working with us on this deal, and feel sure that our relations will be mutually satisfactory."

With this letter the Penney Compeny forwarded to respondent the leases previously executed by respondent in duplicate, now executed by the Penney Company, and attached to each lease, executed by the Penney Company and ready for execution by respondent, a rider or supplement in the following form:

"Supplementary agreement, attached to and forming part of lease dated June 15, 1926, between Western Building Corporation, organized under the laws of the State of South Dakota, as lessor, parties of the first part and J. C. Penney Company, a corporation existing under the laws of the State of Deleware, as lessee, parties of the second part. The parties hereto mutually agree to the following stipulations:

"Lessee is to pay its first year's rental in advance by depositing the amount discounted at the rate of seven (7%) percentum per annum in the Mitchell National Bank to be held in escrow by said bank until title to the property is taken by lessor, at which time the amount is to be paid by the bank to the lessor.

"The rental shall begin as of July 15, 1926, at Four hundred and fifty (450.00) Dollars per month, lessee being privileged however to make such alterations as may be possible on the unoccupied portion of the building prior to July 15, 1926.

"Lessee agrees to purchase plate glass insurance for the lessor, at the expense of the lessor.

"It is mutually understood and agreed that the lessee contemplates alterations which include the installation of a modern store front and show windows and changes in or removal of some or all of the present partitions and entrances in the leased premises, the changes proposed to be done in a first-class manner. A new elevator entrance and a passageway leading to the present elevator is to be constructed next to the south wall of the building in the same style as that now in use in said building, providing for entrance into the elevator shaft and stairway and necessary changes in the stairway leading to the second floor and the work of changing the elevator to provide for a south entrance thereto, it being understood and agreed that the changes in the elevator, cage and mechanism shall be at the expense of the lessor, and paid for by the lessor when the work is completed.

"It is further understood and agreed that if means can reasonably be devised to provide adequate coal storage space without the use of the south coal room, measuring about 10′ x 28′, the lessor will permit lessee to remove said south coal room and to use the space now occupied thereby, without additional rental.

"It is further understood and agreed that the North part of

the basement is reserved to the use of the lessee. This space being available for displaying and selling merchandise.

"It is further understood and agreed that the architect of the lessee will confer with the architect of the lessor in planning the construction. It is also agreed that the supervision of the construction will be covered by the architect of both the lessee and lessor.

"This supplementary agreement is subject to all of the covenants, conditions, agreements and stipulations of said lease dated June 15, 1926, except as herein qualified.

"Western Building Company,
"By Donald Fellows, President.

"Attest:

"Harold Dean Brown, Secretary.

"[Seal.]

"J. C. Penney Company, Inc.
"By Geo. H. Bushnell, Vice President.

"Attest:

"L. A. Bahner, Secretary.

"[Seal.]"

On or about July 16, 1926, respondent executed the supplementary agreements, returned one duplicate copy of the lease and annexed supplementary agreement to the Penney Company, and filed the other for record with the register of deeds of Davison county. It seems very clear that the lease and the supplementary agreement thereto attached constitutes the contract between the parties and supersedes all previous negotiations. It is clear that respondent realized that the lease as originally prepared dealt with the subject of alterations because in its letter to the Penney Company, under date of June 17th, it suggests the addition of certain matter to the typewritten portion of the section of the lease relating to alterations. It is to be noted that this suggestion was not for a substitution, but for an addition. It is clear from the Penney Company's letter to respondent under date of June 28, 1926, and from the provisions of the supplementary agreement, that the use of all or a portion of the north basement for the display and sale of merchandise was contemplated as a future possibility. Since the plans and specifications for changes in the building before the Penney Company moved into it did not include the preparation

of this space for selling merchandise and since it was not adapted to be so used without alterations and changes, there appears, quite plainly at this stage of the proceedings the definite possibility of at least such changes and alterations at some future time as might be reasonably necessary to make the north basement space available for retail merchandising.

For convenient reference we here repeat the portions of the lease and supplementary agreement relating to the matter of alterations. The lease provided as follows:

"Alterations

"The said lessor does hereby give to the lessee the right and privilege at all times during the continuance of this lease or any renewal thereof, to make at its own expense such changes, improvements, alterations and additions to the herein leased premises, as lessee may desire, providing the above mentioned are not of the kind and character that will impair the structural strength of the building of which the herein leased premises are a part or the whole. If at the time of making any changes, improvements, alterations and additions to the herein leased premises the lessee is obliged, by reason of any State laws or local ordinances to expend moneys over and above the sum necessary to alter the premises to suit the special needs of the lessee then the lessor shall reimburse the lessee for all such additional expense. Lessee is to make its own alterations requiring from the contractor who does the work a bond protecting the lessor and lessee as their interest may appear from loss or damage to property or person during the construction work. Lessor is to bear the expense of turning the elevator around to face the south as will be shown on Lessee's plans and specifications."

The supplementary agreement attached to and forming a part of the lease provided:

"It is mutually understood and agreed that the lessee contemplates alterations which include the installation of a modern store front and show windows and changes in or removal of some or all of the present partitions and entrances in the leased premises, the changes proposed to be done in a first-class manner. A new elevator entrance and a passageway leading to the present elevator is to be constructed next to the south wall of the building in the

same style as that now in use in said building, providing for entrance into the elevator shaft and stairway and necessary changes in the stairway leading to the second floor and the work of changing the elevator to provide for a south entrance thereto, it being understood and agreed that the changes in the elevator, cage and mechanism shall be at the expense of the lessor, and paid for by the lessor when the work is completed. * * *

"It is further understood and agreed that the architect of the lessee will confer with the architect of the lessor in planning the construction. It is also agreed that the supervision of the construction will be covered by the architect of both the lessee and lessor."

As earlier stated, all parties knew that extensive alterations and changes were to be made in the premises by the Penney Company prior to occupying the same in order to render the building initially suitable to their contemplated uses. It seems very plain and in fact is practically conceded by all parties that these were the specific changes and alterations which respondent had in mind when it suggested in its letter of June 17th certain additions to the alteration clause of the lease, which suggestions were later embodied, in substance, in the supplementary agreement prepared and attached to the lease by the Penney Company. It is further conceded by all parties that the provisions of the supplementary agreement with reference to changes and alterations relate specifically to those changes and alterations which were in contemplation of both parties as proposed to be made before the Penney Company occupied the building, and it is at this point that the views of the parties appear to diverge.

The position of the Penney Company may be stated about as follows: That the lease contained a general provision relating to alterations and repairs which the lessee might desire to make at any time during the continuance of the lease. That the provisions of the supplementary agreement with reference to alterations related specifically and solely to those particular alterations contemplated by both parties to be made before occupying the premises. That, excepting as to those particular initial alterations, the general provision of the lease is in no manner affected by the provisions of the supplementary agreement. That, since the altera-

tions and changes contemplated to be made before occupying the premises, and which constituted the subject-matter of the alteration provisions of the supplementary agreement, were long since carried out and completed, the provisions of the supplementary agreement with reference to alterations have been, so to speak, fully executed and performed. The Penney Company therefore maintains that their right thereafter to make alterations or changes during their tenancy and particularly their right to make alterations and changes now contemplated, is governed by the provisions of the lease with reference to alterations in like manner as though nothing had been said about alterations in the supplementary agreement.

The exact contention of respondent with reference to the point is somewhat difficult to discover. It appears, however, to be about this: That the provisions of the supplementary agreement with reference to alterations, although admittedly relating only to the specific changes and alterations contemplated to be made before occupancy, really took the place of the provisions of the lease itself with reference to alterations and, in substance, abrogated them. Therefore, the alterations contemplated by the supplementary agreement having been fully completed, the lessee has no remaining right to make any changes or alterations of any sort save as it may secure the express consent and permission of the lessor, and any changes or alterations amount to the commission of waste as at the common law.

We cannot agree with the view advanced by the respondent. We think the provisions of the supplementary agreement with reference to alterations were in fact supplementary to, and not destructive of, the alteration provisions of the lease as originally drawn. With reference to the specific alterations and changes contemplated to be made before occupancy of the premises, the right of the lessee under the original lease provisions is modified, controlled, and directed by the provisions of the supplementary agreement. Those provisions of the supplementary agreement were entirely deleted from the picture, however, by the mutually satisfactory completion of those particular changes and alterations. As to any changes, improvements, alterations, or additions that the lessee might subsequently desire to

make during its tenancy, the sole measure of its right is to be found in the general provisions of the original lease. By the terms of the lease the lessor has extended a most broad and liberal permission to the lessee in this regard. The lessee is given the right and the privilege at any time to make at its own expense "such changes, improvements, alterations and additions to the herein leased premises as lessee may desire." The only limitation upon this right and privilege is that the changes, improvements, etc., shall not be of a kind and character "that will impair the structural strength of the building of which the herein leased premises are a part." The lessee is to make its own alterations and require a bond from the contractor. In the instant case no question is raised as to the reliability of the contractor. He is the same builder who had the contract for the original and extensive changes and alterations in 1926, which were apparently completed to the satisfaction of all concerned. Whether or not he has furnished bond for the protection of the lessor and lessee as their interests may appear is not conclusively shown by the record, but no contention is made on that point.

■ ■ The right of the lessee to make alterations, changes, improvements, or additions must be limited, of course, to the premises leased, and it has no right without the consent of the lessor to do anything in other portions of the building. It is difficult therefore to see how the lessee can claim any right to construct a sewer pipe vent to the roof of the building if, as we assume, such work would require construction or installation of any sort in portions of the building not under lease to it. Aside from that one item, it would seem that the only objection which respondent can be heard to urge to any of the proposed alterations is that the same will "impair the structural strength of the building of which the herein leased premises are a part." The phrase "impair the structural strength of the building," while doubtless difficult, if not impossible, of precise and complete definition, would not seem very difficult of reasonable and intelligent practical application. To impair means, of course, "to make weaker; to lessen injuriously." New Oxford Dictionary. "The structural strength of a building" refers to the strength of the building considered as a structure. A building is properly denominated a structure, and "structure" means

primarily a thing built, erected, or fabricated. From an engineering point of view, a structure may be more technically defined as any artificial construction in which all the component parts are intended to be and remain in equilibirum and at rest relatively to each other. The strength of any structure consists in its ability under any given circumstances to remain in a condition of stability and equilibirum; that is, its ability to resist the breaking or the displacement of any of its parts, its ability to sustain without failure its own weight, together with all loads and stresses imposed upon it. Whether a given change or alteration in a structure if properly carried out and performed will result in an impairment of its strength as a structure will usually be a question for expert testimony by competent engineers though, of course, the case may sometimes be so plain either one way or the other that the layman is competent to judge of it. In the instant case upon the testimony in the present record it is difficult to see how any of the contemplated changes or alterations when carried out according to the plans and specifications for the work can seriously be claimed likely to result in any impairment of structural strength, with the possible exception of the excavating in the basement. It is suggested, particularly because of the condition of the soil under the southeast corner of the building, that excavation there as proposed might allow the soil under the foundations to slip or shift and thus permit a settling or cracking of the walls of the building and a weakening of the entire structure. Bjodstrup, who was an experienced builder and very familiar with local conditions, testified that in his opinion there was no such danger to be anticipated from any of the work contemplated if done in the manner proposed and contracted for. To the same general effect was the testimony of the architect Dixon. The architect King testified that, in view of the nature of the soil and the concentration of load at certain points, there would be danger of slippage "if too much soil was removed." He did not undertake to testify that there would be slippage in the event of a removal of the amount of soil contemplated by the plans and specifications for the proposed alterations, nor does he appear in his testimony to take into account the retaining of the soil by concrete retaining walls and concrete floor in the manner contemplated in the proposed changes. It

seems quite doubtful, even as to this item, as to whether any evidence thus far introduced sufficiently establishes that the proposed change will impair the structural strength of the building. We think, however, that we need not undertake to determine the question of the sufficiency of the evidence regarding this particular item upon the present record, inasmuch as the testimony upon this point in the event of a new trial may be far from identical with that now before us.

It is very clear upon the record that the findings, conclusions, and judgment below were made and entered upon an entirely erroneous theory as to the rights of appellant lessee with reference to the making of changes and alterations, and in substance upon the theory that the lessee was in the same situation as it would have been had the lease contained no provisions whatever with reference to alterations. As we have stated above, we are of the opinion that the lease means what it says, and that the lessee has the right and privilege during the continuance thereof to make at its own expense such changes, improvements, alterations, and additions to the premises as it may desire, providing that they are not of the kind and character that will impair the structural strength of the building within the meaning of that phrase as we have above discussed it.

The judgment and order appealed from must therefore be reversed.

All the Judges concur.