**Perry Jay MELLEMA, Plaintiff and Appellee,**

v.

**Ginger Renae MELLEMA, Defendant and Appellant.**

**No. 15327.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 15, 1987.

Decided June 24, 1987.

Arlie Brende of Cadwell, Sanford & Diebert, Sioux Falls, for plaintiff and appellee.

Lee R. Burd, Sioux Falls, for defendant and appellant.

WUEST, Chief Justice.

In this divorce action the former wife and mother (Ginger) appeals from the circuit court's decree of divorce granting the father and former husband (Perry) primary custody of the couple's two sons. We affirm.

The couple was married in July 1981. At the time of the trial, in January 1986, their two sons were three and one-half and two years old. The trial court concluded: "The Plaintiff [Perry] and Defendant [Ginger] shall have joint custody of the minor sons of the parties. It would be in the best interests of the minor children that joint custody be awarded to the Plaintiff and Defendant, and that the primary and physical care, custody and control be awarded to Plaintiff." (Conclusion 3). The findings of fact supporting this conclusion about the childrens' best interests were equally brief:

> The Plaintiff and Defendant have both been responsible for the health, education and welfare of the children. The Plaintiff and Defendant are both fit persons to have the legal custody of the minor sons. However, the Plaintiff shall have the actual and physical care, custo-

dy and control of the minor sons of the parties because he is more capable of making decisions on their behalf, and in their best interests. The Defendant shall have reasonable visitation with the minor sons of the parties. (Finding XI)

The trial court also found that Ginger had stayed out late on occasion. Ginger's brief also addresses other findings that refer to "extreme cruelty." Extreme cruelty, however, relates to fault, which is a consideration in awarding alimony but is not to be considered in awarding custody of children. *Madson v. Madson*, 313 N.W.2d 42 (S.D. 1981).

Ginger raises the sole issue of whether the trial court abused its discretion in awarding primary custody of the children to Perry. She does not claim that any findings are clearly erroneous.

At trial Ginger attempted to imply that Perry's choice of long-haul trucking as a line of work early in their marriage in 1982 indicated a lack of concern for her and their then unborn first son. Perry began trucking while Ginger was pregnant and asked her if she would consider an abortion. She thought it was a "bad time" to start trucking but later agreed that Perry only trucked for three months after the child was born. He finally quit trucking when she asked several times if he would not like to be home with the baby more. In fact, Perry testified he eventually quit trucking for several reasons, "most important of which was to be home after [the baby] was born."

Although Ginger also attempts to imply that Perry's frequent job changes indicate some kind of character weakness, the record reveals reasonable explanations for nearly every change. After he quit trucking in 1982 he held four different jobs until he finally began his first job as an auto salesman in 1983. Perry finally had to be let go from this auto sales position because, in the eighteen months he worked at this job, he had been involved in two minor accidents. Because of the accidents his employer's insurance would no longer cov-

er him. Nevertheless, he was given an excellent recommendation by his employer and was again hired immediately as an auto salesman at another auto dealer. There was no evidence that these job moves resulted from any instability on Perry's part and he explained that each move increased his income. Contrary to the statement in Perry's brief, however, he did not testify that he had ever quit his other jobs in Sioux Falls to spend more time with his sons.

While Ginger also mentions Perry's three accidents over four years, she does not state how they should affect the decision to award custody. Nor did the trial court enter any finding that these accidents should have affected the issue of custody. Suffice it to say, the accidents were either not Perry's fault or were relatively minor.

Ginger also argues she has been the major caretaker of the children. During the weekdays, however, both she and Perry worked and the children were cared for by one of their grandmothers. Some weekday evenings Perry also worked. Part of the year he also spent one evening a week at church choir practice and bowling. His car racing hobby, which was the greatest source of irritation to Ginger, took up Friday nights but was limited to the month of July in 1985. Clearly, Perry placed the major burden of caring for the children in the evening on Ginger before he gained temporary custody of the children.

Although Ginger refers to Perry as having "exposed" their sons to his girl friend, the evidence did not show that anything improper occurred when the girl friend visited Perry's home. He met this girl at choir practice and, although he had gone to Florida to visit her and her family, he testified he had not even kissed her.

Ginger also claims that the children's aggressive behavior has increased and their language has deteriorated since they have been in Perry's custody. The only *facts* supporting these contentions, however, was some testimony that the older boy kicks more now and that the boys

occasionally say "damn it" or use the term "fart." Even if this behavior were unusual or undesirable there was no evidence linking it to Perry or showing whether it was simply learned from playmates.

The parties' testimony directly conflicted over whether Ginger had ever smoked marijuana. The issue was not pursued at length at trial, however, and the trial court did not enter any findings to resolve this conflict for us.

During the break-up of the marriage, Ginger sometimes stayed out until the early morning hours and usually ended up at a girl friend's place, chiefly to get away from Perry and to give him some responsibility for the boys. She denied she saw other men or got drunk on these occasions. She explained that on one occasion she once went to an out-of-town bar without Perry because she was not interested in watching his car racing, which was a sore spot in the marriage. On the evenings Ginger left the boys with Perry and stayed out late she never left before the boys were in bed. When Perry suggested counseling over these matters Ginger said she was "trying to find the old me again." And when Ginger asked for a divorce she explained she wanted one, "Because I don't want to be responsible to anyone anymore," and offered to give custody of their sons to Perry. Ginger's request for a divorce and her search for herself was precipitated by Perry's purchase of his race car. She regrets her past behavior and she now goes out socially only once every two or three months because she is unable to afford it. There was no evidence that this behavior affected the boys.

There was some evidence that the boys were affected by some of Ginger's other behavior, however. They were especially distressed by her statements about her not loving their father. And for a period of time when Perry had custody of the boys Ginger continued to live in the home. While she was still in the home more than one incident occurred when she refused to provide the boys some basic requests for care because, she said, they were actually in their father's custody.

Despite all the evidence about the character of these two parents, Perry showed concern for the boys' eating habits and they enjoyed family activities together such as yard or housework, visiting and working on the farm of Perry's parents, playing in the park, car racing during the short time that Perry owned a race car, motorcycle riding, and attending church. At least one witness observed that the boys were generally more disciplined and respectful of others since Perry has had temporary custody of them.

Ginger relies heavily on the trial court's oral pronouncements of its impressions of Perry as a "stinker," and a "dictator," and as having an over-inflated opinion of his own decision-making ability. Indeed, the record, all of which we have chosen not to detail, clearly exposes Perry's character faults. But the trial court's statements have little effect on this court's review.

Any expression of opinion or views by the trial judge extraneous to his decision in the manner and form contemplated by law is of no binding force or effect as a matter of law either upon the trial judge himself or any one else. *Cf. Agard v. Menagh,* 60 S.D. 262, 244 N.W. 379; *Klundt v. Hemenway,* 60 S.D. 248, 244 N.W. 377. Such expressions by the trial judge are, of course helpful and indeed almost necessary in advising counsel as to the views of the court and for the information of counsel in drafting findings and conclusions for presentation to the court. But such expression of opinion constitutes no proper part of the record on appeal, whether announced in the form of an oral statement in open court transcribed by the reporter or in the form of a memorandum or letter addressed to counsel. [cites omitted].

*Western Bldg. Co. v. J.C. Penney Co.,* 60 S.D. 630, 636–637, 245 N.W. 909, 911–912 (1932). Thus, we ignore the trial court's oral pronouncements and limit our review to the written findings and conclusions.

See Jones v. Jones, 334 N.W.2d 492 (S.D. 1983); Hitzel v. Clark, 334 N.W.2d 37 (S.D. 1983).

Admittedly, the ample evidence of Perry's behavior may have shed some light on his abilities as a parent. But in spite of Perry's behavior the trial court still found that he was a fit parent to have custody. Cf. Langerman v. Langerman, 336 N.W.2d 669 (S.D.1983); Hanks v. Hanks, 296 N.W.2d 523 (S.D.1980). We believe the court was able to see that Perry's behavior toward Ginger, while it might have been a proper consideration in determining the issue of extreme cruelty and fault for the break-up of the marriage, was not entirely the proper measure of the best interests of the children. See Holforty v. Holforty, 272 N.W.2d 810 (S.D.1978).

"The court's primary consideration when awarding custody is the best interest of the children and not the shortcomings of the custodial parent. [cites omitted]" Haak v. Haak, 323 N.W.2d 128, 130 (S.D.1982); see SDCL 30–27–19. Here, the trial court had to award primary custody to one of two parents, neither of whom was perfect. "[T]he trial court has broad discretion in awarding custody of minor children, and ... the trial court's decision regarding custody will be reversed on appeal only upon a clear showing of an abuse of that discretion. [cites omitted]" Saint-Pierre v. Saint-Pierre, 357 N.W.2d 250, 254 (S.D. 1984). Under the circumstances in this case the trial court did not abuse its discretion in awarding actual and physical custody to Perry. Indeed, if physical custody had been awarded to Ginger, Perry might also just as readily have argued that the court abused its discretion.

The judgment of the trial court is affirmed.

Ginger's request for attorney's fees on appeal is denied.

MORGAN and MILLER, JJ., concur.

HENDERSON, J., concurring in result.

SABERS, J., dissents.

HENDERSON, Justice (concurring in result).

As this opinion does not do justice to the domestic position of this father, with my pen I shall do so. This father has an exceptionally strong relationship and bond with his two boys. This includes spending his leisure time with them, to include going to parks, attending church, and spending the day at his parents' farm with these boys. Father was given temporary custody of these children and kept a neat home and good meals on the table. Each statement thus far recited is supported by the record in this appeal. Not one witness could come forward and testify that the father was not doing a good job as a custodial parent. The trial court considered the best interests of the children and not, necessarily, the shortcomings of the custodial parent. Haak v. Haak, 323 N.W.2d 128, 130 (S.D.1982). It is obvious that the father is not perfect and does have some shortcomings but his strengths in raising these boys far outweighs his shortcomings. And his strengths far outweighs the character weaknesses demonstrated by the mother which led to the breakup of this marriage.

This case reveals a tragic domestic scenario, for this mother decided, outright, and made no bones about it, that she was "trying to find the old me again." She told her husband that "I'm getting back to the person I knew." She further told him "You took me out of a lifestyle and I'm getting back into it." These remarks she fulfilled. This mother experienced behavioral changes which manifested themselves in conduct that I shall detail in only some respects. She began to drink intoxicants and remain out until 5:00 in the morning. She told her husband that she was looking for somebody that she could love. She was able to place alcoholic drinks in the refrigerator but told one of the boys, when he came downstairs in the morning and wanted Cocoa Wheats, that he could "Ask your daddy, he has custody. He is supposed to take care of you."

At the trial, the mother reflected that her deficient attitude around the house and toward her husband had a poor effect on the boys. She admitted that the father was a good disciplinarian. It was the mother who quit marital counseling. It is little wonder that the trial judge gave the father temporary custody.

Contrast the manner in which the mother and father fed the boys. Mother would oftentimes not provide an evening meal but would supply the boys with potato chips, pop, and cookies. Father would return home and find this situation and would be upset because the boys did not want to then eat their evening meal. Once the father was given temporary custody, and the mother was no longer in the home, the boys ate regular meals. Eating regular meals, being with Dad, going to church with Dad, and then spending time at the grandparents' farm is a wholesome environment to raise boys.

Apparently, the mother wanted a divorce and the father wanted to know why. According to his testimony, she retorted: "Because I don't want to be responsible to anyone anymore." Also, the record reflects when mother was confronted with the possibility of losing custody, she expressed that she could have more kids or more boys. All of this evidence came before the trial judge in this case. Our oft-quoted rule on trials before the court, is as follows: The credibility of witnesses and weight to be accorded their testimony and the weight of the evidence is for the trial court—not the review court. *Lukens v. Zavadil*, 281 N.W.2d 78 (S.D.1979); *Scott v. Wagner*, 274 N.W.2d 266 (S.D.1979).* This Court is not at liberty to change the findings where the trial judge has resolved conflicts in the evidence. *Mulder v. Tague*, 85 S.D. 544, 186 N.W.2d 884 (1971).

The gratuitous remarks by the trial judge in this case are ill taken and are not evidence. Such remarks cannot be used to determine (a) a rightful decision below or (b) the base of appellate review. As these remarks were neither evidence nor part of a decision, they should be disregarded as gratuitous remarks without probative value or decisional base. We limit our review to the decision of the court as reflected by findings of fact and conclusions of law. *Jones v. Jones*, 334 N.W.2d 492 (S.D.1983).

When the trial judge decided "primary and physical care, custody and control" would be awarded to father, father was living in the family home. This was the only home the boys ever really knew and it represented a stable environment; the mother, on the other hand, was living in an apartment. Mother testified that she liked to go out a lot and that the father liked to stay at home with the boys. There was no discretion exercised in this case which was clearly against reason and evidence. *Moore v. Moore*, 354 N.W.2d 732, 733 (S.D. 1984) (citing *Herndon v. Herndon*, 305 N.W.2d 917, 918 (S.D.1981)).

SABERS, Justice (dissenting).

I dissent.

I find more support in the record for the trial court's statements that plaintiff was a "stinker," a "dictator," and a "selfish" and "insolent" father than I do for the statement that he was a "decision maker." Even if he was a "decision maker," as opposed to a "dictator," the best interests of the children were not served by giving him physical custody. The Mother is immature but can improve. The Father's character traits are already mature enough to only worsen with age. In the meantime, I fear those traits will harm the children. This was a clear abuse of discretion. *Herndon v. Herndon*, 305 N.W.2d 917 (S.D.1981).

* For basic tenets of review, followed by this Court for decades, with citations to buttress same, see special writing of Henderson, J., in

*Pankratz v. Miller*, 401 N.W.2d 543, 549–50 (S.D. 1987).