1999 SD 35

**Glenn FUERSTENBERG, Plaintiff and Appellee,**

v.

**Jill FUERSTENBERG, n/k/a Jill Harberts, Defendant and Appellant.**

No. 20300.

Supreme Court of South Dakota.

Considered on Briefs Sept. 17, 1998.

March 24, 1999.

Mary Ann Giebink, Gary W. Conklin of Galland Legal Clinic, Sioux Falls, South Dakota, for plaintiff and appellee.

Richard L. Johnson, Sioux Falls, South Dakota, for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] If a child has lived out-of-state with his mother for ten years following a divorce, may the court that granted the initial custody decree rule on a request for modification from the father who still lives in state? The mother appeals the circuit court's refusal to decline jurisdiction and its order changing physical custody. Because the circuit court entered the initial custody decree and thereafter continued to hear, without objection, custody and visitation disputes between the parents, even though the mother and child lived out-of-state, we conclude the court did not abuse its discretion in finding South Dakota a convenient forum to hear the present dispute. However, we reverse the court's decision to modify custody and remand for a more systematic consideration of the traditional factors relevant to the best interests of the child.

### Facts

[¶ 2.] Jill (Fuerstenberg) Harberts and Glenn Fuerstenberg were married on August 31, 1984. They had one child, Keith, born February 27, 1986. The marriage ended in divorce on January 25, 1988. By agreement, Keith's custody went to Jill, with Glenn having reasonable visitation. Jill remarried in 1988 and moved to Minnesota. She and her new husband, Kevin Harberts, had one child, Allison. Kevin and Jill divorced in 1995 and she eventually settled in Mankato, Minnesota with her two children. Glenn remarried in 1993. He and his wife live in Sioux Falls, South Dakota. In the ten years following their divorce, Jill and Glenn frequently returned to circuit court in South Dakota with disputes over child support, visitation and custody. Glenn sought orders to show cause over visitation problems on March 18, 1988, January 27, 1989, and February 23, 1993. Jill petitioned for child support modification on September 12, 1989 and March 23, 1995.

[¶ 3.] In February 1995, Glenn moved to change Keith's physical custody. He con-

tended that Jill was not allowing him his court-ordered visitation; Keith's grades were falling and his school attendance was "less than acceptable"; and Jill regularly took Keith to a bar to eat and, while there, let him play "pull-tabs." Glenn was concerned with Keith's unhealthy eating habits, lack of friends and absence of out-of-home activities. He claimed that Jill and her family believed they had "the power to cause evil" by casting a "hex" on persons, including Glenn. Glenn did not want his son raised in this "negative atmosphere." After a hearing the court denied a change in custody. Glenn asked for reconsideration and the court responded by ordering a psychological evaluation of Keith.

[¶ 4.] Glenn took Keith to John Sivesind, Ed.D., who evaluated him in the summer of 1995. With his mother's recent move, Keith was about to enter the fourth grade at a new school in Mankato. Sivesind found Keith to be in the low-average range of intellectual functioning, with a history of academic difficulties. Sivesind thought the "divorce of [Keith's] parents is unsettling to the point that it set him back academically." Adding to the disruption was Jill's recent divorce from Harberts. "It needs to be noted," Sivesind wrote, "that his step-father was the primary male role model and caretaker in his life from 1987 to 1995." Keith referred to Harberts as "Dad." Sivesind apparently found it insignificant that in the third grade Keith had one incident of bad behavior, resulting in a visit to the principal's office. In the recommendation portion of his report, Sivesind concluded, "Keith has been loved and well taken care of." His adjustment problems in response to his parents' divorce "seems to have resolved." Sivesind especially lauded "Keith's report that neither parent has said anything negative about the other."

[¶ 5] Then, without having been requested to do so, and concededly without having any firsthand knowledge of Jill, Sivesind offered a custody recommendation. "While it may go beyond the scope of this evaluation, this evaluator would like to make the recommendation that Keith be placed in the physical custody of his father." Sivesind had two reasons: (1) Glenn had remarried and children of divorce benefit from their parents'

remarriage and (2) children "make a better psychological adjustment if they are in the custody of the same sex parent." Nonetheless, at the end of his report Sivesind wrote, "In summary, Keith appears to be happy, healthy, and psychologically well functioning." On August 16, 1995, based on this report, the court declined to reconsider its custody decision, stating:

> After reviewing the report of the psychologist, I am satisfied that the child is not being damaged psychologically by either parent. The reasons the psychologist gives for recommending the custody change to the father does not justify a change of custody. The child is happy in both households and expresses concern about leaving his step-sister if he went to live with his father. The father must show a change of circumstances and that the best interests of the child require a change of custody. The facts do not justify a change.

[¶ 6.] In April 1997, Glenn again moved to change physical custody and requested home studies. Glenn alleged Keith's grades had seriously declined; he had behavioral problems at school; his friends exerted a "bad influence" over him; he suffered a considerable weight gain in a short time caused by improper nutrition; Jill would not allow Keith to participate in after-school sports, even though Keith had expressed an interest in playing basketball and hockey; Jill took both Allison and Keith to Jim's (her boyfriend) and stayed overnight at his house more than once; Jim had stayed overnight at Jill's home on more than one occasion; and Keith told Glenn that Keith thought Jill and Jim "sleep naked."

[¶ 7.] Jill denied Glenn's allegations, claiming Keith's grades and behavior had improved, and that she met with Keith's teachers and developed a plan for Keith's continued academic success. Jill also averred that Keith's doctor was not concerned about his weight gain, and that Keith participated in Cub Scouts and played soccer in Minnesota. She admitted that she and Jim were in a romantic relationship, but denied that Keith or Allison had ever been in a position to observe any behavior detrimental to their moral upbringing. She

submitted statements from Keith's Cub Scout den mother, his school "team room" supervisor and his math teacher. All indicated that he was not a disciplinary problem and that his homework was being completed. Jill did not oppose the request for a home study, but wanted it done by a licensed Minnesota professional, so the cost might be covered by her medical insurance.

[¶ 8.] Asserting that collateral references and all information on Keith's well-being were in Minnesota, Jill moved the court to decline jurisdiction in South Dakota as an inconvenient forum, to allow a court in Blue Earth, Minnesota to hear the matter. The court denied Jill's request, finding that South Dakota was not an inconvenient forum. Recurrent disputes concerning Keith had been heard in circuit court over the years, even though he lived in Minnesota. The court deemed itself far more familiar with Keith's circumstances than any Minnesota court would have been in hearing the matter anew. In addition, Keith's Minnesota school and medical records could be easily obtained.

[¶ 9.] At the custody hearing, Dr. Sivesind's second report was entered into evidence. This assessment was similar to the one he conducted in 1995, but, as requested by the court, its express purpose was to determine "if there has been a substantial and material change that would warrant a change in custody." Sivesind noted that, although there were differences between his 1995 and 1997 evaluations, there were no "substantial and material changes in Keith's situation." He found that "the most significant changes" in Keith were his aggressive behavior, withdrawal and social problems. Sivesind characterized Keith as sometimes shy, withdrawn and secretive. Keith reported that he was often teased about his weight and he expressed concern about his withdrawal and social problems, but he would not acknowledge any increased aggressiveness. From Sivesind's perspective, although Keith had some behavior problems in school, he behaved better there than he did at home, at least as that behavior was reported by Glenn. From examining Keith's school records and psychological testing, Sivesind deduced that Keith was "working to his ability," but "could

be more focused and extend more effort." Sivesind believed Keith needed help to improve his reading skills, but "he would not qualify for any formal academic remediation programs." Keith was enthused about playing sports, and Sivesind agreed that Keith needed more opportunity to make and maintain peer relationships. On a disquieting note, Sivesind observed that to improve his chances of obtaining custody Glenn had become "invested in making Keith appear more symptomatic."

[¶ 10.] Keith consistently told Sivesind that he wished to stay with his mother. He wanted his father to "back off in court," and for Kevin Harberts, his former step-father, to "stop making trouble" for him and his sister, Allison. Unlike his first report, Sivesind made no final recommendation, but he reiterated Keith's desire to remain with his mother, affirming that it was in the court's discretion to decide if Keith's wishes should be followed. In sum, Sivesind stated, "this evaluator finds that academically, behaviorally, and socially there have not been substantial and material changes in Keith's situation."

[¶ 11.] Another psychological assessment was performed in Minnesota by Dr. Allen Coursol, Ph.D., as requested by the agency Jill hired to complete a home study. This evaluation concluded Keith did not show any clinical symptoms of depression or anxiety. Nonetheless, Coursol detected an "adjustment disorder," characterized by dysphoria, agitated moods, and mild sleep disturbance associated with worry. He suggested that Keith's increased behavioral problems at school resulted from two sources of stress: (1) his poor school performance and (2) this custody dispute with its potential for removal from his home. Keith proclaimed his wish to stay with his mother in Minnesota and the evaluator noted that Keith was "emotionally distraught" over the possibility of having to live with his father. Keith said he was more comfortable at his mother's home and did not feel "safe" at his father's. He also wanted to remain close to his sister. On Jill's ability as a parent, the psychologist observed that she had "good listening skills," was "highly involved with facilitating Keith's academic functioning," and she appeared to present a

stimulating and structured home environment. Coursol's ultimate assessment: Keith would not benefit from a change in environment because Jill was currently providing the structure and emotional setting he needed.

[¶ 12.] Jill presented testimony from one of the home study evaluators, Sharon Fruechte. She recommended that Keith remain in the care of his mother. The court, however, discounted the recommendation as biased. Jill paid for the study and the counselor readily admitted that more time had been spent with Jill than with Glenn. The court also found the home study incomplete because the counselor had spoken to Jill's family, but not to Glenn's.

[¶ 13.] One of Glenn's most persistent complaints was that Jill had continually failed to sign releases to allow him access to Keith's medical and school records. Nonetheless, Glenn obtained a copy of one of Keith's homework logs on which Keith had drawn a swastika. Glenn also produced a homework assignment in which Keith had characterized himself as a child of divorce when asked to describe his family. Glenn felt these things reflected Keith's growing behavior problems and a poor self-image. Jill denied withholding medical releases and stated she had a talk with Keith about the swastika and what it represented.

[¶ 14.] After considering the testimony and the psychological reports, the court granted Glenn's motion to change physical custody, finding that: (1) Jill refused to sign releases allowing Glenn access to Keith's medical and school records, despite numerous court orders over the years to do so; (2) she constantly "badmouth[ed]" Glenn to Keith; (3) she had several different relationships and one marriage since she divorced Glenn; (4) she allowed men to sleep at her house overnight while Keith was present; (5) she was court-ordered in the past to properly feed Keith; (6) Keith's "school paper showing a drawing of a swastika signals that a problem is manifesting itself;" (7) Jill consistently signed Keith's homework logs, even though Keith did not finish his school work; (8) Jill had been given repeated chances to be a

conscientious parent to Keith but was unsuccessful; and (9) Jill exhibited a negative attitude toward Glenn, consistently failed to be a conscientious parent to Keith, and her living situation was unhealthy for him and had a negative influence on him. The court concluded, therefore, that Keith's best interests required a change of physical custody to Glenn, with Jill receiving visitation. Keith now lives with Glenn and his wife in Sioux Falls.

[¶ 15.] Jill appeals on the following issues: (1) Whether the trial court erred in denying Jill's motion to decline jurisdiction in South Dakota as an inconvenient forum; and, (2) whether the trial court erred in changing Keith's physical custody.

### Standard of Review

[¶ 16.] We review factual determinations under the clearly erroneous standard. *Therkildsen v. Fisher Bev.*, 1996 SD 39, ¶ 8, 545 N.W.2d 834, 836; *Lindquist v. Bisch*, 1996 SD 4, ¶ 16, 542 N.W.2d 138, 141. Questions of law, including statutory construction, we decide without deference to the circuit court's conclusions. *West Two Rivers Ranch v. Pennington County*, 1996 SD 70, ¶ 6, 549 N.W.2d 683, 685. Whether a court is a convenient forum under the Uniform Child Custody Jurisdiction Act (UCCJA) is a decision we review under the abuse of discretion standard. *Lustig v. Lustig*, 1997 SD 24, ¶ 5, 560 N.W.2d 239, 241 (citing 1 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 13.5, at 795 (2d ed 1987) (citing cases)); *see generally Winkelman v. Moses*, 279 N.W.2d 897 (S.D.1979).

### Analysis and Decision

#### 1. Interstate Custody Disputes under the UCCJA and PKPA

[¶ 17.] To determine initial, modification and enforcement jurisdiction in interstate child custody disputes we examine both the UCCJA and the Parental Kidnapping Prevention Act (PKPA). First, we decide if the court has jurisdiction under the UCCJA; then, we review the prohibitions of the PKPA.[1] The policy underlying these laws is

---

1. Juliet A. Cox, *Judicial Wandering Through a*    *Legislative Maze: Application of the Uniform*

to eliminate "forum shopping," to discourage competition between jurisdictions, and to empower those courts most suitable to address the best interests of the child. *Zappitello v. Moses*, 458 N.W.2d 784, 786 (S.D.1990).

[¶ 18.] Because the rules controlling modification jurisdiction differ from those governing initial jurisdiction, it is important to note that this case does not involve deciding initial jurisdiction.[2] The question here centers on jurisdiction to modify an existing divorce decree. Under the UCCJA, the state that granted the initial custody decree maintains exclusive continuing jurisdiction over later custody questions until all the litigants have moved from the state or the initial decree state declines to further exercise jurisdiction. SDCL 26–5A–14; *see* SDCL 25–4–45 (divorce court maintains modification jurisdiction in custody matters); Brigitte M. Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA*, 14 FamLQ 203, 214 (1981); *see also* UCCJA § 6, comment, National Conference of Commissioner on Uniform State Laws (stating "once a custody decree has been rendered in one state, jurisdiction is determined by Sections 8 [unclean hands provision] and 14"); *see, e.g., Yurgel v. Yurgel*, 572 So.2d 1327, 1331–32 (Fla.1990); *Ladurini v. Hazzard*, 130 Idaho 192, 938 P.2d 1230, 1233 (1997). We conclude that the circuit court had continuing jurisdiction under the UCCJA because the original custody decree was entered in South Dakota and one of the parties, Keith's father, still resided here.

[¶ 19.] With interstate custody disputes, the PKPA plays a superintending role. 28 USC § 1738A. Congress enacted the PKPA to create uniformity in dealing with interstate custody determinations, and to fill any gaps in the UCCJA with its variants in

many states. The PKPA commands that full faith and credit be given to initial custody decrees rendered in accord with the PKPA. At least to the extent that compliance with the provisions of both the UCCJA and PKPA may be unattainable, the PKPA preempts conflicting state law. *See generally* Roger Baron, *Child Custody Jurisdiction*, 38 SDLRev 479, 487 (1993). Similar to the UCCJA, under the PKPA the state granting the original custody decree maintains exclusive continuing jurisdiction to modify custody decrees so long as the child or one of the contestants remains in that state. 28 USC § 1738A(d). As South Dakota was the child's original home state where the initial decree was entered and the father continues to live here, we conclude that the assumption of jurisdiction was not prohibited by the PKPA.[3]

[¶ 20.] A court may nonetheless decline its jurisdiction "if it finds that it is an inconvenient forum to make a custody determination ... and that a court of another state is a more appropriate forum." SDCL 26–5A–7. Ultimately, the question comes down to whether "it is in the interest of the child that another state assume jurisdiction." *Id.* In making this decision, a court should consider the following nonexclusive factors:

(1) If another state is or recently was the child's home state;

(2) If another state has a closer connection with the child and his family or with the child and one or more of the contestants;

(3) If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state;

(4) If the parties have agreed on another forum which is no less appropriate.

*Child Custody Jurisdiction Act and the Parental Kidnapping Act to Child Custody Determinations,* 58 MoLRev 427, 431 n 41 (1993).

2. Initial jurisdiction is generally governed by SDCL 26–5A–3.

3. There are three prerequisites under the PKPA for continuing jurisdiction: (1) the initial decree must have been made in accord with the provisions of the PKPA; (2) the decree state's jurisdic-

tional requirements must continue to be met; and (3) the decree state must remain the residence of the child or of any contestant. 28 U.S.C. § 1738A(d). The PKPA establishes jurisdictional priority, favoring first, continuing jurisdiction of the original decree state; second, the child's home state; third, the state with the most significant-connection; and fourth, jurisdiction when no other jurisdictional basis exists. *See Nadeau v. Nadeau*, 716 A.2d 717, 722 (R.I.1998).

*Id.* The trial court considered itself fully conversant with the history in this case, with Keith's ongoing home and school situation, and, of course, with the court file. In addition, the court believed it could readily obtain from Minnesota the school records, medical data, and other material facts pertaining to Keith's life and living environment. In the ten years since Glenn and Jill were divorced, necessary witnesses and relevant information were adequately available to the judge in South Dakota when any proceeding was held. Keith spent much time in South Dakota on court ordered visitation, including all but two weeks each summer. He also attended summer school here. Most significantly, the court had entertained, without objection, many earlier proceedings concerning Keith even though he lived in Minnesota with his mother. Thus, Keith and Glenn had a close connection with South Dakota and up-to-date evidence on Keith's present or future care, protection, training, and personal relationships was already of record.[4]

[¶ 21.] On the other hand, we recognize that this is a close question, considering that Keith's home state for a decade was Minnesota, and that much of the dispute in this case converged around Keith's care and education there. Several countervailing indicators point to Minnesota as a more convenient forum. Problems Glenn claimed Keith experienced in school were directly contradicted in reports written by Keith's teachers and his "team room" supervisor. Glenn related in an affidavit, for example, conversations he had with Mary Mortier, one of Keith's teachers, about problems Keith was having in class. In a point-by-point written statement, Mortier disputed some of the more controversial remarks Glenn attributed to her. In its findings, the court apparently accepted Glenn's version over Mortier's; specifically, the court found that Jill had "consistently" signed off on Keith's uncompleted homework assignments. According to Mortier, however, "there were a few times when Keith did not fill in his assignment log and Mrs. Harberts signed it anyway, but it only happened two or three weeks." Glenn made much of Keith's weight gain, even claiming that Mortier expressed concern about it. Yet she denied in her written statement ever having mentioned it and even disclaimed having thought of it as a concern. When the obesity question was brought to Keith's Minnesota medical doctor, his report in the record shows no concern about Keith's weight. These matters suggest that Minnesota would have been a convenient forum to litigate these intensely contested facts. Nonetheless, there is also evidence in the record to support the court's decision and we review judgments on whether to decline jurisdiction under SDCL 26–5A–7 pursuant to the deferential abuse of discretion standard. *Johnson,* 477 N.W.2d at 605–06. Therefore, finding no abuse, we affirm the trial court's denial of Jill's motion to decline jurisdiction. We now address the trial court's decision to change custody.

### 2. Change of Custody

[¶ 22.] In deciding the best interests of a child in a custody dispute, the court must consider the child's temporal, mental and moral welfare. SDCL 25–5–10; *Jopling v. Jopling,* 526 N.W.2d 712, 717 (S.D.1995); *see Kost v. Kost,* 515 N.W.2d 209, 212 (S.D. 1994) (citation omitted); *Friendshuh v. Headlough,* 504 N.W.2d 104, 106 (S.D.1993) (citing *Peterson v. Peterson,* 449 N.W.2d 835, 837 (S.D.1989)). Between parents adversely

---

4. *See Harris v. Melnick,* 314 Md. 539, 552 A.2d 38, 46–47 (1989) (Maryland not improper forum as original custody decree and subsequent orders on custody and visitation had been rendered in Maryland although child's home state was Colorado for past seven years); *Smith v. Smith,* 594 N.E.2d 825, 827 (Ind.Ct.App.1992) (despite Florida being the child's home state, Indiana was not an inconvenient forum because parties continued to use courts in Indiana, where original decree had been entered, for custody and visitation disputes); *Johnson v. Johnson,* 477 N.W.2d 603, 605–06 (S.D.1991) (Minnesota had been child's home state for two years, but South Dakota still not an inconvenient forum). *But see Schlumpf v. Superior Court,* 79 Cal.App.3d 892, 145 Cal.Rptr. 190 (1978) (although California retained "significant contacts" jurisdiction nine years after child's departure, UCCJA § 7 (forum non conveniens) required court to stay proceedings in favor child's present home state of Wyoming); *Ziegler v. Ziegler,* 107 Idaho 527, 691 P.2d 773 (Ct.App. 1985) (decree state may decline to exercise continuing jurisdiction when remaining parent has voluntarily litigated custody in child's new home).

claiming custody, neither may be preferred over the other. SDCL 25-5-7. There are no formulas for making child custody decisions. *See, e.g., Hanks v. Hanks,* 296 N.W.2d 523 (S.D.1980); *Spaulding v. Spaulding,* 278 N.W.2d 639 (S.D.1979); *Isaak v. Isaak,* 278 N.W.2d 445 (S.D.1979). It is not for this Court, but for the trial court, to gauge the credibility of the witnesses and to weigh the significance of their testimony. *Kost,* 515 N.W.2d at 212 (citing *Mellema v. Mellema,* 407 N.W.2d 827, 831 (S.D.1987)). Trial courts possess broad discretion in deciding the best interests of a child; their decisions will only be disturbed upon a finding of abuse of discretion. *Id.* (citing *Anderson v. Anderson,* 472 N.W.2d 519 (S.D. 1991)).

▬▬▬ [¶ 23.] Discretion imports wide latitude, but it also imposes solemn responsibility. *Michelson v. United States,* 335 U.S. 469, 480, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948). Established principles governing child custody decisions cannot be disregarded. Here, the trial court scarcely addressed the traditional factors bearing on the best interests of the child.[5] Instead, it reproached the mother for what the court perceived as inadequate parenting and lack of cooperation. The court made no findings of fact on the father's fitness, stability, or his parenting assets and liabilities. Indeed, the court made no findings about the father whatsoever, except to note that he was "an involved, concerned parent who exercises his visitation and pays his child support." We encourage trial courts to take a balanced and systematic approach in these cases. Child custody disputes should not be decided solely on a listing of faults ascribed to one parent or on the petty and often extraneous quarrels between former spouses. A few of the guiding principles, pursuant to the "best interests" standard, a court may use in adjudging the facts to determine who will have the primary care of a child are set out below.

## A. Fitness

▬▬▬▬▬ [¶ 24.] Which parent is better equipped to provide for the child's temporal, mental and moral welfare? SDCL 25-5-10. A court need not find one parent unfit in order to give custody to the other. The shortcomings and foibles of the parents are not determinative. An award of custody is not a reward or punishment for good or bad behavior. *Wiesner v. Wiesner,* 80 S.D. 114, 119 N.W.2d 920, 922 (1963). Some of the factors important to the fitness question are: (1) mental and physical health, *see, e.g., Aulner v. Aulner,* 296 N.W.2d 533 (S.D.1980); *Masek v. Masek,* 89 S.D. 62, 228 N.W.2d 334 (S.D.1975) [*Masek I* ]; (2) capacity and disposition to provide the child with protection, food, clothing, medical care, and other basic needs; (3) ability to give the child love, affection, guidance, education and to impart the family's religion or creed; (4) willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent; (5) commitment to prepare the child for responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and (6) exemplary modeling so that the child witnesses firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

[¶ 25.] The trial court made few findings on these vital issues. It found that the mother had to be ordered in the past not to provide meals in bars to Keith. Yet apparently this had not been a problem since the last custody decision in 1995. It found that the mother had "consistently" signed off on Keith's uncompleted homework assignments. The mother conceded she had mistakenly signed Keith's homework logs, but there was no substantiation in the record to establish that she had "consistently" done this. In fact, information supplied by the school indicated that Keith was completing his homework assignments. The court also found that Jill had not provided releases to the school and Keith's doctors, so that Glenn could have the same information about Keith that Jill had.

---

5. To the trial court's credit, it insisted that Keith receive an impartial psychological assessment. That was the reason he was taken to Dr. Sivesind on both occasions. "The trial court has the right and the duty to have appropriate studies and evaluations made[,] ... even if counsel and the parties fail to present all types of evidence needed for making an informed, fair, and impartial custody decision." *Anderson,* 472 N.W.2d at 523 (Amundson, J., dissenting).

It is not clear from the record, however, the extent of this problem or how this adversely affected Keith. Notably, none of the fitness considerations were applied to the father.

## B. Stability

■ [¶ 26.] Who can provide a stable and consistent home environment? *Jasper v. Jasper*, 351 N.W.2d 114, 117–18 (S.D.1984); *Langerman v. Langerman*, 336 N.W.2d 669, 671–72 (S.D.1983); *Haskell v. Haskell*, 279 N.W.2d 903, 906 (S.D.1979); *Wright v. Stahl*, 73 S.D. 157, 39 N.W.2d 875, 876–77 (S.D. 1949). Factors to be considered in this category include: (1) the relationship and interaction of the child with the parents, stepparents, siblings and extended families, *Hansen v. Hansen*, 327 N.W.2d 47, 48–49 (S.D. 1982); (2) the child's adjustment to home, school and community, *Jasper*, 351 N.W.2d at 117–18; (3) the parent with whom the child has formed a closer attachment, as attachment between parent and child is an important developmental phenomena and breaking a healthy attachment can cause detriment;[6] and (4) continuity, because when a child has been in one custodial setting for a long time pursuant to court order or by agreement, a court ought to be reluctant to make a change if only a theoretical or slight advantage for the child might be gained. Otherwise, the child's sense of sustainment and belonging may be unnecessarily impaired.[7] In these circumstances, the court should discern a distinct need to remove a child from one setting and a reason to place the child in a new one.

[¶ 27.] The trial court made no findings on these important considerations. Yet, according to Dr. Sivesind, while in the custody of his mother, "Keith has been loved and well taken care of." Also, according to Sivesind's first report, Keith was "happy, healthy, and psychologically well functioning." In his second report, Sivesind saw little change in Keith's situation.

## C. Primary Caretaker

■ [¶ 28.] Who is more committed and involved in parenting the child? *Saint–Pierre v. Saint–Pierre*, 357 N.W.2d 250, 255 (S.D.1984). In some jurisdictions the "primary caretaker" parent is given preference in custody disputes either by statute or case authority. *See Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (W.Va.1981). Here, this factor is important not by reason of any preference it might accord, but because it is a fair indicator of which parent has been more responsible to the child in the past. *See generally Voelker v. Voelker*, 520 N.W.2d 903, 907 (S.D.1994) (mother, as primary caretaker, was proper custodial parent); *Kost*, 515 N.W.2d at 212 (custody award to father of handicapped child upheld as father was parent primarily responsible for care and mental development of child). After a custody dispute begins, some contestants try to make themselves appear as good as possible. But the trial court must consider who was more devoted to the child when there was no court to impress. The primary caretaker can be identified by determining which parent invested predominant time, care and consistency in raising the child. It is evidenced in such matters as spending time with the child, preparing meals, playing, attending to medical care, choosing clothing, involvement in school, attending the child's extracurricular activities, reading to the child, preparing birthday parties, knowing the pediatrician, consistent disciplining, arranging transportation, and providing appropriate clothing,

---

6. Of course, a child may be attached to a parent for the wrong reasons. *See Yarnall v. Yarnall*, 460 N.W.2d 161, 163–64 (S.D.1990) (mental health professionals concluded that children were attached to mother due to mother's indoctrination of hatred toward father).

7. Trial courts should not underestimate the importance of maintaining stability in children's lives.

[A]lthough courts have considered both the remarriage of the noncustodial parent and the custodial parent's sexual activity as factors supporting the application to modify custody, it appears that neither factor necessarily supports such a change. When more meaningful variables are considered—such as interparental conflict, residential changes, and the young child's attachment needs—it becomes clear that custody modification is justified only in special cases.

Joan G. Wexler, *Rethinking the Modification of Child Custody Decrees*, 94 Yale LJ 757, 760 (1985).

foods, and toys. Steinberg, *Parental Custody: An Overview*, Trial, April (1981). Closely related to this question is the issue of which parent has more time available to spend with the child. *Prentice v. Prentice*, 322 N.W.2d 880, 882 (S.D.1982).

[¶ 29.] Identifying the primary caretaker becomes less important as the child grows older and more independent. A maturing child will probably need more guidance and discipline than the nurturing required in younger years. A person who was the primary caretaker during the child's early youth may still be the best person to care for the older child, but this is not universally true, because different parenting skills are required. Jeff Atkinson, *Criteria for Deciding Child Custody in the Trial and Appellate Courts*, 18 FamLQ 1, 18 (1983). The trial court made no findings in this area, although it is obvious from the record that Jill had been Keith's primary caretaker all his life. It is also disturbing that Dr. Sivesind reported that Keith's former step-father was his "primary *male* role model and caretaker in his life from 1987 to 1995." (emphasis added).

### D. Child's Preference

[¶ 30.] "If the child is of a sufficient age to form an intelligent preference, the court may consider that preference" in deciding custody. SDCL 25-4-45; *Hansen*, 327 N.W.2d at 49; *Isaak*, 278 N.W.2d at 447; *Pochop v. Pochop*, 89 S.D. 466, 233 N.W.2d 806, 808 (1975). We think it is especially important to give attention to the needs and wishes of children either approaching or in adolescence. Of course, the final decision remains in the hands of the court, but the child's concerns deserve consideration. The trial court made no findings on this factor even though Keith emphatically and repeatedly told all the experts that he wanted to remain with his mother.

### E. Harmful Parental Misconduct

[¶ 31.] Where there is no evidence that a parent's marital misconduct has a harmful effect on a child, it should not be taken into account in awarding custody. *Hanks*, 296 N.W.2d at 525; SDCL 25-4-45.1. On the other hand, when marital misconduct has a demonstrable effect on the child, the fitness of the culpable parent is brought into question. *Madson v. Madson*, 313 N.W.2d 42, 43-44 (S.D.1981); *Haak v. Haak*, 323 N.W.2d 128, 130 (S.D.1982). Furthermore, the harmful effect is self-evident when parental misconduct is committed in the presence of a child old enough to perceive the misconduct. *Wolff v. Wolff*, 349 N.W.2d 656, 658 (S.D.1984); *Nauman v. Nauman*, 336 N.W.2d 662, 664 (S.D.1983) (although court did not condone mother's practice of living with boyfriend, change of custody question was moot after mother married him); *Rivers v. Rivers*, 322 N.W.2d 864, 865 (S.D.1982) (modification of visitation proper because father's practice of living with a woman contradicted religious values mother was trying to teach child). The court found that Jill permitted her boyfriend to stay at her home overnight. The court specifically questioned the moral message this might impress on Keith and his sister. But this factor, like the others, is only one indicator in a matrix of considerations. *See generally Van Driel v. Van Driel*, 525 N.W.2d 37, 39 (S.D.1994). It still must be balanced with all other factors and with the other parent's benefits and shortcomings.

### F. Separating Siblings

[¶ 32.] Siblings should not be separated absent compelling circumstances. *Mayer v. Mayer*, 397 N.W.2d 638, 642 (S.D. 1986) (citation omitted). This is no less significant when children are half-siblings. *Id.* at 644 (citation omitted). "Justice requires that society exercise its moral duty to insure that children in a family enjoy the right to remain together, to share each other's lives, and to grow up together, until such time as necessity and the welfare of the children, itself, requires their separation." *Id.* Keith and Allison are only three years apart. A court ought to be especially concerned about keeping together siblings who are at or near the same age. Of course, maintaining children in the same household should never "override the controlling question of their best interests." *Crouse v. Crouse*, 1996 SD 95, ¶ 21, 552 N.W.2d 413, 419. By all accounts, Keith had a close relationship with

his sister. In its oral decision given at the end of the custody hearing, the trial court remarked that their relationship had been a substantial consideration in the past, as the court had previously strove to keep them together. The court stated the present changed circumstances justified overriding that consideration. Yet the court made no fact findings on what compelling circumstances existed to justify separating Keith and Allison. It simply entered a conclusion of law holding that compelling circumstances made it in Keith's best interests to live with his father.

### G. Substantial Change in Circumstances

■ [¶ 33.] It has long been the rule in South Dakota that, to modify a custody decree rendered after a contested hearing, the moving party must show a substantial change in circumstances. SDCL 25-4-45; *see Kappenman v. Kappenman,* 523 N.W.2d 410, 413 (S.D.1994); *Andersen v. Andersen,* 399 N.W.2d 363, 365 (S.D.1987); *Masek v. Masek,* 90 S.D. 1, 237 N.W.2d 432, 434 (S.D. 1976) [*Masek II* ]. This requirement shields children and parents from the incalculable detriment caused by "endless and vexatious litigation[.]" *Masek II,* 237 N.W.2d at 434.

[¶ 34.] To prevail, Glenn had to show a substantial change in circumstances from the time of the court's denial of his request for reconsideration in August 1995. Although the court rendered fact findings adverse to the mother, it made no findings on what substantial changes occurred between the custody hearings of 1995 and 1997. Sivesind's report indicated no substantial change. A trial judge, of course, is not bound to accept an expert's opinion. Yet the court, after taking some testimony, adjourned the hearing and recommended that Glenn take Keith back to Sivesind for a second evaluation because his earlier report indicated that Keith, in the court's words, was "perfectly psychologically well adjusted." The court reasoned, "If Dr. Sivesind would say he's perfectly adjusted like he was two years ago, I would like to see that." Sivesind's second report effectively confirmed exactly what the court asked to see.

### Conclusion

[¶ 35.] The guidelines outlined above are, in most instances, merely consultative. A court is not bound to make a finding on every one. Yet in important matters of child custody, a court's decision should be balanced and methodical. After examining the record and the court's findings, we believe the trial court abused its discretion in failing to assess both Glenn and Jill as parents and in overlooking the traditional legal factors in deciding the best interests of the child in custody disputes. On remand, the court will have the opportunity to reconsider the evidence in light of these factors and to compare Keith's circumstances while living with his father.

[¶ 36.] Affirmed in part, reversed in part, and remanded.

[¶ 37.] MILLER, Chief Justice, and AMUNDSON and GILBERTSON, Justices, concur.

[¶ 38.] SABERS, Justice, concurs in result.

SABERS, Justice (concurring in result).

[¶ 39.] I concur in result of a reversal and remand for a new hearing because siblings, even half siblings, should not be separated absent compelling reasons. Here, it appears that there are no compelling reasons to separate these half siblings. *Mayer v. Mayer,* 397 N.W.2d 638, 642 (S.D.1986) (citations omitted).