ZINTER, Justice
(dissenting).
[¶ 62.] I join the dissent of Justice Meierhenry. I write to point out that the majority virtually overlooks the reason why the circuit court determined a change of custody was necessary. There is no dispute that this child had endured five years of a particularly contentious child custody arrangement. There is also no dispute that this child had been unsuccessfully treated more than one hundred times over two years for a conduct disorder arising from the parental alienation syndrome existing under Joleen’s custodial arrangement. Although a resolution of the child’s problems was the core issue of the ease, the majority devotes only three[4] of its fifty-nine paragraphs to the issue, choosing instead to devote virtually all of its analysis to the parties’ ongoing disputes relating to child support. Moreover, the majority fails to even acknowledge the circuit court’s underlying findings of fact on alienation, the prospects for change, and the unchallenged findings in which the circuit court expressly rejected Joleen’s credibility on these issues.
[¶ 63.] I would not decide this case on the parties’ history of child support litigation. In my view, we should review the testimony of the mental health professionals, the circuit court’s credibility findings regarding Joleen and Mike on parental alienation, and the circuit court’s underlying findings of fact regarding each parent’s ability to do what was necessary to resolve the child’s problems. When those issues are examined under the correct standard of review, they reflect a circuit court decision that was not clearly erroneous and one that was based on reason and the evidence.
[¶ 64.] Contrary to the Court’s statement, the circuit court’s decision was not based on Joleen’s “purposefully attempting *749 to alienate Thomas from Mike.” See supra ¶46. On the contrary, the circuit court’s findings focused on the fact that whether purposeful or not, Joleen was more responsible for the alienation, and that Jo-leen would be “unwilling” or “unable” to change her “very troubling” behavior if the same custodial arrangement were to continue. See infra ¶ 68. This Court’s decision to focus on Mike’s trial contention rather than the circuit court’s findings predictably leads to the Court’s result.
[¶ 65.] Our appellate function should be to review the evidence and reasons relied upon by the circuit court to reach its decision. “No precise formula exists for making a custody determination, but the decision should be balanced and methodical.” Zepeda v. Zepeda, 2001 SD 101, ¶ 13, 632 N.W.2d 48, 53 (citing Fuerstenberg, 1999 SD 35, ¶ 23, 591 N.W.2d at 807). In this case, there is no dispute that the circuit court addressed the Fuerstenberg factors. The primary basis[5] for the circuit court’s decision was its findings that Joleen was more responsible for Thomas’s parental alienation syndrome, that Joleen was unlikely or unwilling to change, and the experts’ agreement that without some change in the parents’ conduct, Thomas’s adjustment disorder would continue as it had remained since 2002. Ultimately, the circuit court’s determination was based on the finding, not addressed by this Court, that: “Father [was] better situated to model what it means to be a good parent in such areas as allowing the child to have a healthy and loving relationship with the other parent, and in not portraying the other parent in a negative light for the child.”
[¶ 66.] Factually, these findings are well supported. There is no dispute that at the time of trial in 2007, Thomas was suffering from an adjustment disorder as a result of the parents’ conduct in the custody situation that had been in place since February 2002, a period during which Jo-leen was the primary custodian. There is also no dispute that the status quo was not working. As the Court notes, Dr. Van Gilder indicated that Thomas was exhibiting behaviors consistent with one or both parents engaging in parental alienation. Supra ¶ 26. However, the Court fails to address Dr. Van Gilder’s specific testimony that Thomas’s presence in Joleen’s home caused him to be conflicted such that he could not comfortably express his love for his father:
I indicated to [parents] that I did not necessarily know nor was I identifying *750 where this was coming from but that [Thomas’s] behaviors were consistent with [alienation]. Some of the statements he was making villainizing his father, the misbehavior, I mean, the anxiety anticipating events and visits with his father. These types of things are kind are [sic] part and parcel of the flavor of alienation.... I’m not seeing this behavior occurring at Mike’s. I think part of the reason that [it] is occurring more with Joleen is because Thomas is conflicted, that he feels he cannot be comfortable about dad in mom’s home.
(Emphasis added.) Dr. Van Gilder further explained:
[Thomas] makes statements that suggest that he doesn’t love his father or he doesn’t like to go to the farm. Those statements are typically made in a manner that doesn’t necessarily match with how he feels. In other words, there is no anger behind it or not enough anger behind it or enough reasoning behind it. So that implies to me that maybe these are things that he feels like he needs to say.
Dr. Van Gilder opined that this was unhealthy for Thomas. And, as the Court concedes, Dr. Van Gilder had been counseling Thomas for over two years (starting at age three) which involved over one hundred visits, yet Thomas had not improved. See supra ¶25. Dr. Van Gilder did not believe that Thomas would struggle to adapt to a change in custody. Id.
[¶ 67.] As the Court further concedes, Renee Turbak, the home custody evaluator, indicated that Joleen was at greater fault for Thomas’s alienation. Supra ¶ 31. Dr. Clayborne also agreed that parental alienation syndrome was present, and he “suspected Joleen and her mother have made derogatory comments about Mike to and around Thomas.” Dr. Clayborne noted that he could not determine what Jo-leen’s intentions were in making derogatory comments, “but it does appear that she minimizes Mike’s role and does not value his input into parenting of their son. This type of attitude is the essence of [Parental Alienation Syndrome] and should be discontinued if you wish for [the child] to have a healthy relationship with both parents.” Dr. Clayborne finally indicated that this conduct was probably one of the reasons why Thomas tended to be more physically violent in Joleen’s home.
[¶ 68.] In addressing this primary concern, the circuit court entered sixty-six findings of fact, most of which are not addressed by this Court. In those findings, the circuit court explained that whether Jolene’s alienation behavior was intentional or unintentional, she was more at fault; she was not credible on this issue; her behavior was not likely to change; and therefore, a change in the existing custodial relationship was in Thomas’s best interests. It must be emphasized the circuit court specifically found: that Joleen dismissed the possibility that Mike could or should play a significant role in Thomas’s life; that Joleen’s efforts in changing her behavior, as of September 2007, had not been successful and had brought out anxiety, anger and other negative behaviors in Thomas; that those behaviors were more frequently displayed in Joleen’s home, and Mike had few discipline problems with Thomas; that it would be most healthy for Thomas to perceive that he could freely express his love and desire to be with both parents, but it did not appear that Thomas could comfortably express his love for his father and his desire to spend time with him in Joleen’s home; that Thomas portrayed his father as a villain in therapy, while it happened only occasionally with respect to his mother; that Thomas felt reluctant to talk freely about his father at *751 his mother’s house, and the anger and disdain Joleen expressed for Mike in Thomas’s presence appeared to now extend to Joleen’s family; that Thomas made statements without anger that he did not love his father and did not want to go to the farm, implying that these were matters Thomas felt he had to say rather than matters he actually felt; that Joleen believed Mike’s parental judgment was inferior and he could not be trusted to do what was best for Thomas or to protect his safety, and therefore, Thomas was worse off having to visit his father’s home; that Joleen treated Mike not like a key family member, but more like an annoying acquaintance that Thomas must see and put up with; that although both parties, at times, failed to promote a positive relationship, Joleen had consistently failed to promote such a relationship; that the record was full of negative statements by Thomas about his father indicating that they were heard in his mother’s home; that Joleen and her mother had made derogatory comments about Mike to or around Thomas; that while Mike was credible on these key issues, Joleen displayed characteristics or tested positively for histrionic behavior and narcissism, and her testimony was less than credible about the issues concerning parental alienation and making decisions about Thomas without Mike’s involvement; that Joleen had strong feelings about what took place at Mike’s residence and she exaggerated concerns for Thomas’s physical and emotional safety; and, that although blame was not placed entirely with either parent, inappropriate behavior had occurred and Joleen was chiefly responsible for it.
[¶ 69.] Thus, the circuit court specifically found:
Mother’s conduct has not demonstrated any meaningful progress in avoiding such behavior. She has continued to attempt to alienate Thomas from his father. These efforts have taken many forms, including, but not limited to: making derogatory remarks about father-and allowing others to do so-in Thomas’s presence; creating an environment for Thomas where it is not okay to express his love for his father; routinely failing to include father in significant decisions about Thomas’s life; making it more difficult than necessary for father and Thomas to spend time together; portraying father as a villain in Thomas’s presence.
The circuit court then reiterated that the experts indicated something had to change: if “the same custodial arrangement were to continue, it is likely that mother would be either unwilling or perhaps unable to change her behavior relating to efforts to alienate Thomas from his father.” The court found that there was no reason to believe that if Joleen continued to retain custody, the communication and alienation concerns were going to dissipate in as much as they had not lessened despite extensive outside help. Therefore, a change in custody was required.
[¶ 70.] This Court has not identified any evidence indicating how these underlying findings — the ones that the circuit court actually used as the basis for its decision — were clearly erroneous. In light of these underlying findings and the record previously cited, and especially in light of the circuit court’s express rejection of Joleen’s credibility on the central issue of her alienation, I cannot join an opinion that decides the case on the parties’ various disputes regarding child support. For the same reason, I cannot join this Court’s assumption that there was no difference between the parties in terms of their conduct towards each other and the detrimental effect it was having on Thomas; ie., that both parents had engaged in inappropriate conduct. See supra ¶¶ 45-46. Cer *752 tainly, we should not begin a course of analysis that fails to consider harmful parental misconduct by rationalizing that “both parties” had some degree of involvement. See id. (rationalizing that both parties attempted to spend as much time as possible with the child and both parties made inappropriate comments). Ultimately, the language of the Court, reversing on the parties’ history of child support litigation, reflects that it has retried the case by substituting its judgment for that of the circuit court on the relative importance of the Fuerstenberg factors.
[¶ 71.] The circuit court attempted to resolve a five-year, unworkable child custody arrangement under which Thomas was unquestionably being harmed. Because the circuit court’s underlying findings were made on the express rejection of Joleen’s credibility regarding this principal issue, we should continue to follow our often stated “ ‘recognition that trial courts are in a better position to make these difficult choices because the parents are present in the courtroom and the judge is better able to assess [the situation] firsthand.’ ” Hogen v. Pifer, 2008 SD 96, ¶ 9, 757 N.W.2d 160, 168 (quoting Maxner v. Maxner, 2007 SD 30, ¶ 11, 730 N.W.2d 619, 622). More importantly, because the circuit court’s underlying findings reflect that its decision was an attempt to change an extended, harmful child custody arrangement, the circuit court’s decision was not one exercised to “ ‘an end or purpose not justified by, and clearly against, reason and evidence.’ ” Hrachovec v. Kaarup, 516 N.W.2d 309, 311 (S.D.1994) (quoting Herndon v. Herndon, 305 N.W.2d 917, 918 (S.D.1981)). I cannot, as does the majority, justify a continuation of this harmful situation on the belief that it is an “unfortunate[ ] ... reality of the child custody and visitation process.” Supra ¶ 45. No matter what collateral failings of the parties the majority chooses to focus upon, “our brightest beacon remains the best interests of the child.” Zepeda, 2001 SD 101, ¶ 13, 632 N.W.2d at 53 (citation omitted). Therefore, unlike the majority, I cannot characterize the circuit court’s focus on the harm that was being perpetrated on this child by the existing custody arrangement as “‘a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.’ ” Hogen, 2008 SD 96, ¶ 9, 757 N.W.2d at 163 (quoting Maxner, 2007 SD 30, ¶ 11, 730 N.W.2d at 622). I therefore dissent.

. In those paragraphs, the Court summarily dispatches the issue by declaring there are "serious discrepancies in the record” concerning this matter. The Court, however, does not identify any evidence suggesting that Joleen was not more at fault in causing the problems. See supra ¶¶ 44-46.

. The Court reverses on its determination that the circuit court “failed to give sufficient weight” to, and "disregarded” Mike’s delay in, making his child support payments. See supra ¶¶ 49, 51. The Court is incorrect. The circuit court expressly considered this issue, and although it found it troubling, the circuit court found that factor was outweighed by the unsuccessful treatment of the parental alienation syndrome the child was enduring as a result of the existing custody situation. Further, until today, it was well established that this Court does not reweigh the evidence to derive new factual findings. State v. Labine, 2007 SD 48, ¶ 18, 733 N.W.2d 265, 270. It must also be noted that in an attempt to support its own appellate finding, the Court relies on factual findings of a child support referee that were not admitted into evidence. Compare ¶¶ 20-22 (reciting findings of Referee Howey-Fox) with ¶ 32 (acknowledging that Howey-Fox’s report and recommendation were not admitted in evidence).
With respect to litigiousness, the record is clear that both parties made repeated use of the legal system from the time of the child’s birth. According to Dr. Clayborne, shortly after the birth, Joleen moved to change the child’s name (to remove Mike’s surname). Dr. Clayborne further indicated that Joleen had unilaterally discontinued mediation and denied visitation. In the resulting disputes, both parties utilized a number of attorneys and both parties filed numerous motions relating to custody, visitation, and support.